[846 NE2d 461, 813 NYS2d 31]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN BOYER, Appellant.

Argued February 9, 2006; decided March 28, 2006

## POINTS OF COUNSEL

*Center for Appellate Litigation*, New York City (*David J. Klem* and *Robert S. Dean* of counsel), for appellant. I. The prosecution's failure to provide CPL 710.30 notice of the pretrial police-arranged identification requires preclusion of the identification testimony because the *Wharton* confirmatory-identification exception to the notice requirement is limited to buy-and-bust cases and certainly does not apply where the officer responding to a 911 call catches only a brief and fleeting glimpse of the perpetrator. (*People v Wharton*, 74 NY2d 921; *People v Newball*, 76 NY2d 587; *People v Bernier*, 73 NY2d 1006; *Gilbert v California*, 388 US 263; *United States v Wade*, 388 US 218; *Stovall v Denno*, 388 US 293; *People v Gissendanner*, 48 NY2d 543; *People v Rodriguez*, 79 NY2d 445; *People v Collins*, 60 NY2d 214; *People v Tas*, 51 NY2d 915.) II. Appellant's adjudication and sentence pursuant to New York's persistent violent felony offender statutes are unconstitutional under the principles announced in *Apprendi v New Jersey* (530 US 466 [2000]). (*People v Morse*, 62 NY2d 205; *People v Rivera*, 5 NY3d 61; *Almendarez-Torres v United States*, 523 US 224; *People v Daniels*, 5 NY3d 738; *People v West*, 4 NY3d 749; *People v O'Garra*, 16 AD3d 251, 5 NY3d 766.)

*Robert M. Morgenthau, District Attorney*, New York City (*Alan Gadlin* and *Mark Dwyer* of counsel), for respondent. I. In accordance with established precedent, the lower courts properly concluded that the People were not obliged to provide CPL 710.30 notice of Officer Cremin's identification of defendant. (*People v Wharton*, 74 NY2d 921; *People v Angelo*, 88 NY2d 217; *People v Kello*, 96 NY2d 740; *Watkins v Sowders*, 449 US 341; *People v Chipp*, 75 NY2d 327, 498 US 833; *People v Taylor*, 65 NY2d 1; *People v Laing*, 79 NY2d 166; *Neil v Biggers*, 409 US 188; *Simmons v United States*, 390 US 377.) II. Contrary to defendant's unpreserved claim, he had no constitutional right to have a jury determine whether he was a persistent violent felony offender. (*Apprendi v New Jersey*, 530 US 466; *People v Besser*, 96 NY2d 136; *People v Rosen*, 96 NY2d 329, 534 US 899; *People v Oliver*, 63 NY2d 973; *People v Daniels*, 5 NY3d 738; *Almendarez-Torres v United States*, 523 US 224; *Jones v United States*, 526 US 227; *Blakely v Washington*, 542 US 296; *People v*

*Rivera,* 5 NY3d 61; *United States v Santiago,* 268 F3d 151, 535 US 1070.)

**OPINION OF THE COURT**

Chief Judge KAYE.

The People ask us to extend the "confirmatory identification" exception derived from *People v Wharton* (74 NY2d 921 [1989]) to situations where a police officer's initial encounter with a suspect and subsequent identification of that suspect are temporally related, such that the two might be considered part of a single police procedure. To do so, however, would run afoul of CPL 710.30. Moreover, such an exception would eliminate the protections offered by a *Wade* hearing even when the initial police viewing—albeit part of a single police procedure—was fleeting, unreliable and susceptible of misidentification.

### The Facts

On November 11, 2000, at 6:05 P.M., Michael Todd was in his Manhattan apartment when he noticed someone on the fire escape of the building across the courtyard. Although the sun had set, there were lights in the courtyard and Todd used his binoculars to take a closer look. Todd saw someone he later identified as Black or Hispanic, wearing a red sweater or sweatshirt, dark pants and a hat, but he was unable to make out the details of the individual's face. After seeing the person attempt to open several windows, Todd called 911.

Officers Cremin, Sandoval, O'Boyle and Brennan responded to the radio call of a burglary in progress, involving a male Black or Hispanic. Entering the courtyard, they heard Todd direct them to the fire escape. Eventually, at least two of the officers saw a person crouching on the fire escape several floors up and shone their flashlights on him. Officer Cremin told the individual to come down but he instead ran up the fire escape toward the roof. Officer O'Boyle was able to observe only the individual's clothing. Officer Cremin, however, later testified that he was able to see the individual's face—a male Hispanic with facial hair—as well as his dark jacket and pants when the man, running to the roof, stopped for two to four seconds on the fourth or fifth story fire escape (some 40 to 50 feet up) and looked down. Officer Cremin radioed a description to his fellow officers but did not mention facial hair.

Several officers made it to the roof but the man was already gone. From the roof, they saw an individual wearing a black

jacket and dark pants in a small alley adjacent to the building. One of the officers ordered the man to stop but he ran from the alley. Officer Brennan sent a radio call that a male Hispanic dressed in black was running north on Broadway toward Dyckman Street. Auxiliary Police Sergeant Escoto, who happened to be working in the area that day, heard the radio transmission and spotted defendant, wearing dark pants, a red shirt and black jacket, on Dyckman Street running east toward Broadway. When Escoto approached defendant, defendant was out of breath and sweating. Other officers quickly arrived and defendant was taken into custody.

One of the officers radioed for another officer to come make an identification. Although Officer Cremin was unsure whether he had heard this transmission, he arrived at the scene where defendant was being held, after having searched for the suspect in a subway station and spoken with a possible witness inside a store. Approximately 30 minutes had elapsed since the initial 911 call. Officer Cremin observed defendant sweating, noticed his rapid heartbeat and identified him as the man he had seen on the fire escape. Following defendant's arrest, the prosecution made voluntary disclosures but failed to mention a pretrial identification and served no CPL 710.30 (1) (b) notice. Defendant moved to preclude any identification testimony based on the lack of notice.

During defendant's pretrial *Huntley* hearing—centered on possible suppression of statements not at issue here—Officer Cremin testified about his street identification and also made an in-court identification of defendant. After the hearing, defendant argued that both the out-of-court and in-court identifications should be precluded due to the lack of CPL 710.30 notice. The court, however, found that no notice was required and permitted Officer Cremin to testify at trial about his out-of-court identification and to identify defendant as the individual he had observed on the fire escape. Officer Cremin was the only witness to identify defendant as the individual on the fire escape.

Defendant was convicted of two counts of attempted second-degree burglary. The Appellate Division affirmed the conviction, holding that Officer Cremin's identification "constituted a confirmatory identification that was exempt from the notice and hearing requirements of CPL article 710." We now reverse and order a new trial.

## The Applicable Law

CPL 710.30 could not be clearer. The Legislature has prescribed that, within 15 days of arraignment, the prosecution must serve upon the defendant notice of its intention to introduce at trial "testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case, to be given by a witness who has previously identified him as such" (CPL 710.30 [1] [b]). Upon the service of notice, "the defendant must be accorded reasonable opportunity to move before trial, pursuant to subdivision one of section 710.40, to suppress" the identification (CPL 710.30 [2]). If notice is not given, the prosecution will be precluded from introducing such evidence at trial, unless (1) it is permitted to serve a late notice for good cause shown, or (2) the defendant has moved to suppress the identification testimony and the motion is denied (*see* CPL 710.30 [2], [3]). Neither of these exceptions is relevant here.

CPL 710.30 underscores and facilitates the defendant's right, prior to trial, to test the reliability of any out-of-court identifications that the People intend to introduce. The statutory scheme ensures that the identifications are not the product of undue suggestiveness, and lessens the possibility of misidentification (*see People v Rodriguez*, 79 NY2d 445, 449 [1992]; *People v Newball*, 76 NY2d 587, 590-591 [1990]). The statutory mandate is plain and the procedure simple: the People serve notice, the defendant moves to suppress and the court holds a *Wade* hearing to consider the suppression motion. A court may summarily deny a suppression motion without a hearing only if "[t]he motion papers do not allege a ground constituting [a] legal basis for the motion" (CPL 710.60 [3] [a]). Thus, once the People serve notice that they intend to introduce identification testimony, the defendant may choose to respond with a motion to suppress that testimony and, so long as the motion alleges undue suggestiveness, the defendant is generally entitled to a *Wade* hearing.

We have recognized, however, two instances when, as a matter of law, the identification at issue could not be the product of undue suggestiveness. Under such circumstances, the defendant is not entitled to a *Wade* hearing and thus the People are not obligated to provide notice pursuant to CPL 710.30 (1) (b). This so-called "confirmatory identification" exception carries significant consequences and is therefore limited to the scenarios set forth in *People v Wharton* and *People v Rodriguez*, where there

is no risk of misidentification. As we noted in *Rodriguez*, a court may summarily deny a *Wade* hearing (and hence no CPL 710.30 notice would be required) where the court concludes that, as a matter of law, the identifying, civilian witness knew the "defendant so well that no amount of police suggestiveness could possibly taint the identification" (79 NY2d at 453).

Here, we are concerned only with the *Wharton* scenario. In *Wharton*, an experienced undercover officer observed the defendant face-to-face during a planned buy-and-bust operation. The officer then radioed his backup team with a description of the defendant, who was immediately arrested. As planned, within five minutes of the arrest, the purchasing officer drove past the defendant specifically for the purpose of identifying him, and then again identified him a few hours later at the police station.

Under such circumstances, we held that the defendant was not entitled to a *Wade* hearing (and thus would not be entitled to CPL 710.30 notice) to test the officer's identification, reasoning that

> "[t]he viewing by this trained undercover narcotics officer occurred at a place and time sufficiently connected and contemporaneous to the arrest itself as to constitute the ordinary and proper completion of an integral police procedure. Additionally, as we have observed in this kind of situation, it lent assurance that an innocent person was not being detained by reason of a mistaken arrest. The undercover officer's participation in the criminal apprehension operation at issue was planned, and he was experienced and expected to observe carefully the defendant for purposes of later identification and for completion of his official duties" (79 NY2d at 922-923 [citations omitted]).

We further stated that there is no "categorical rule exempting from requested *Wade* hearings confirmatory identifications by police officers by merely labeling them as such. Where the nature and circumstances of the encounter and identification may warrant, a hearing should and undoubtedly will be held" (*id.* at 923 [citation omitted]).

Thus, the quality of the officer's initial viewing must be a critical factor in any *Wharton*-type analysis. The risk of undue suggestiveness is obviated only when the identifying officer's observation of the defendant is so clear that the identification could not be mistaken. When there is a risk that the quality of

the initial observation has eroded over time, we have consistently held that police identifications do not enjoy any exemption from the statutory notice and hearing requirements (*see People v Mato*, 83 NY2d 406, 410-411 [1994]; *Newball*, 76 NY2d at 591-592; *People v Gordon*, 76 NY2d 595 [1990]). Indeed, in *Gordon* we made clear that

> "[c]omprehensive analysis, not superficial categorization, ultimately governs. . . . Misidentifications should be carefully guarded against lest innocent persons be swept into unlawful arrests and convictions. Trained and perhaps well-intentioned police officers may too easily fall prey to the pressures and official routinization of depersonalized identifications, which could also lead to unacceptable injustices. Showup evidence must be eschewed and, at the very least, subjected to *Wade* hearings in these circumstances to guard against these dangers, even for in-court identifications" (*Gordon*, 76 NY2d at 601).

Here, we cannot conclude that the circumstances of Officer Cremin's initial viewing were such that, as a matter of law, the subsequent identification could not have been the product of undue suggestiveness. Indeed, the initial encounter—at night, while defendant stopped for a few seconds on a fire escape some 40 to 50 feet above the ground—stands in stark contrast to the face-to-face viewing in *Wharton*. Moreover, this was not a situation where the officer was placed on the scene specifically to make an identification, and was therefore focused on identifying the suspect to a backup team. Although we do not suggest that this identification in fact resulted from any impropriety, that is not the test. Indeed, that is the very determination requiring a *Wade* hearing.

The People were required to serve CPL 710.30 (1) (b) notice. To conclude otherwise directly contravenes the simple procedure that has been mandated by the Legislature and would permit the People to avoid their statutory obligation merely because a police officer's initial viewing of a suspect and a subsequent identification might be temporally related. Nor will we draw the courts into the countless factual disputes that such an exception portends.

Defendant's remaining contention regarding New York's persistent violent felony offender statute is without merit.

Accordingly, the order of the Appellate Division should be reversed, defendant's motion to preclude identification testimony granted and a new trial ordered.

R.S. SMITH, J. (dissenting). I dissent, because I think that requiring a *Wade* hearing in cases like this one, where the chance that the hearing will lead to the suppression of evidence is vanishingly small, is a waste of time and puts an unjustified burden on the criminal justice system.

The purpose of a *Wade* hearing is to decide whether a pretrial identification of the defendant violated the defendant's constitutional rights and, if so, what the remedy should be (*see United States v Wade*, 388 US 218, 242 [1967]). In cases where a police officer who observed a crime identified the defendant some minutes or hours later, no court as far as I know has ever even reached the second question. Neither party has cited, the majority does not cite, and I have not been able to find any case in which any court held that an identification of this type violated a defendant's constitutional rights.

This is not surprising, because, when a police officer has observed a crime, and a suspect is arrested shortly afterwards, getting the officer to look at the suspect as soon as possible is not only constitutionally permissible; it is a very good idea. The best way to find out whether the police have arrested the right person or not is to ask the officer who saw the event, and to ask quickly while the offender's appearance is fresh in the officer's mind. This procedure greatly increases the likelihood that people arrested by mistake will be set free at once, and that guilty people will be identified correctly. In this case, as the majority points out, the officer's view of the burglar at the time of the crime was imperfect, and so a mistake in identification was possible—but delaying the postarrest identification would have increased the possibility. It would not have made sense to prevent Officer Cremin from seeing defendant until a lawyer could be found and a lineup arranged, and defendant does not argue that either counsel or a lineup was required here. (*See State v Medley*, 11 Wash App 491, 499, 524 P2d 466, 471 [1974] ["It is patently frivolous to contend that a law enforcement officer whose pursuit of criminal suspects is interrupted may not, a short time later, identify the suspects as the ones whose criminal conduct he has previously observed"].)

But defendant does argue, and the majority holds, that he was entitled to a *Wade* hearing to determine whether Officer

Cremin's identification of him was so tainted by suggestiveness that it deprived him of due process. It is theoretically possible that a due process violation could occur in such an encounter, but the possibility is remote. In *People v Wharton* (74 NY2d 921, 922-923 [1989]), we explained that a trained police officer's identification of a defendant "at a place and time sufficiently connected and contemporaneous to the arrest itself as to constitute the ordinary and proper completion of an integral police procedure" was not the sort of event "ordinarily burdened or compromised by forbidden suggestiveness, warranting a lineup procedure or *Wade* hearing." We pointed out in *Wharton* that such an observation did not entail "the kind of per se suggestive or improper bolstering present in show-up identifications by civilian witnesses" (*id.* at 923). The difference between police officers and civilians is significant here. An officer is much less likely than a civilian to be swayed by the assumption that a suspect who is in police custody must be guilty (*cf. Wade*, 388 US at 234).

In short, I think the procedure followed here was so obviously a desirable one, and the risk of suggestiveness so small, that here, as in *Wharton*, a *Wade* hearing was unnecessary. Several Appellate Division cases agree (*see People v Suleman*, 262 AD2d 337 [2d Dept 1999]; *People v Campbell*, 225 AD2d 1021 [4th Dept 1996]; *People v James*, 220 AD2d 370 [1st Dept 1995]; *People v Starr*, 221 AD2d 488 [2d Dept 1995]).

The majority limits *Wharton* to the situation where the officer's "identification could not be mistaken" (majority op at 432). But *Wharton* does not say or imply that it is so limited, and logic does not support the limitation. The issue to be decided at a *Wade* hearing is not whether the officer made a mistake; that is for the jury to decide at trial. The issue is whether the postarrest identification was unduly suggestive—i.e., whether the circumstances of the identification increased the risk that the officer might err. A prompt postarrest viewing of a suspect by a police officer who saw the crime is virtually guaranteed to diminish the risk of error, not increase it.

The majority relies heavily on the text of CPL 710.30 (1) (b), which, it is true, makes no express exceptions to the requirement that the prosecution give notice when it intends to offer at trial "testimony regarding an observation of the defendant . . . by a witness who has previously identified him." But we have already held—in *Wharton* and in *People v Rodriguez* (79 NY2d 445 [1992])—that exceptions do exist. *Wharton* and *Rodriguez*

both hold that there are cases where no *Wade* hearing is necessary, and that in those cases no notice under CPL 710.30 is necessary either. The question here is how the *Wharton* exception should be defined. I think the majority defines it too narrowly, thus making the system more complicated and cumbersome than it needs to be, and adding unnecessarily to the number of cases in which an offender walks free because police or prosecutors have slipped up in complying with a procedural rule.

Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO and READ concur with Chief Judge KAYE; Judge R.S. SMITH dissents in a separate opinion.

Order reversed, etc.