================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 55
The People &c.,
          Respondent,
          v.
Otis Boone,
          Appellant.

          Paul Skip Laisure, for appellant.
          Seth M. Lieberman, for respondent.
          Legal Aid Bureau of Buffalo, Inc.; Brooklyn Defender
Services, et al.; The Innocence Project, Inc.; Daniel R. Alonso,
et al.; American Psychological Association; National Association
for the Advancement of Colored People et al.; NAACP Legal Defense
& Educational Fund, Inc., amici curiae.

FAHEY, J.:

          In light of the near consensus among cognitive and

social psychologists that people have significantly greater

difficulty in accurately identifying members of a different race

than in accurately identifying members of their own race, the

risk of wrongful convictions involving cross-racial

- 1 -

identifications demands a new approach.  We hold that when identification is an issue in a criminal case and the identifying witness and defendant appear to be of different races, upon request, a party is entitled to a charge on cross-racial identification.

I.

On February 16, 2011, a white man in his 20s was walking in Brooklyn when he was approached by a stranger, a short-haired black man.  The stranger asked to know the time, and the young man retrieved his cell phone.  The stranger snatched the cell phone and fled.  The victim gave chase, until the robber pulled out a knife and told him to stay where he was.  The victim described his attacker as an African-American man, about six feet tall, weighing about 170 pounds, and wearing a baseball cap and a hooded sweatshirt.

Ten days later, a white teenager was walking in the same neighborhood of Brooklyn, sending a text message from his cell phone, when a man behind him asked the time.  The teenager looked back over his shoulder and observed a stranger, a black man, wearing a winter coat and a hat with flaps that covered his ears and the top of his head.  The teenager looked at his cell phone and told the stranger the time.  The stranger then grabbed the phone.  The teenager did not immediately let go, and the robber stabbed him.  The robber then took the phone and fled.  Before the victim was taken to the hospital, he described the

perpetrator to the police as an African-American man, about 18 years old and approximately six feet, two inches tall, and he gave an estimated weight.

Defendant Otis Boone, a black man who was short-haired, 19 years old, and 6 feet tall, and weighed about 170 pounds, was suspected of committing the crimes. On March 14, 2011, defendant was placed in two six-person lineups and the victims separately identified him. The teenager was initially unsure whether defendant was his attacker, but identified him after he spoke the words "What time is it?" Defendant and the fillers in the lineups all wore hats.

Neither cell phone was recovered, and no physical evidence linked defendant to the crimes.

                              II.

Defendant was charged with two counts of robbery in the first degree and other crimes.

At defendant's jury trial in July 2012, during the charge conference, defense counsel requested that the jury be instructed on cross-racial identification. Supreme Court denied the request, on the basis that there had been no expert testimony or cross-examination concerning "a lack of reliability of cross-racial identification." The trial court gave the jury an expanded charge on eyewitness identification, based on the pertinent Criminal Jury Instruction (see CJI 2d [NY] Identification [One Witness]), omitting the part of the pattern

instruction addressing cross-racial identification.

The jury found defendant guilty of both robbery counts. On appeal from the judgment of conviction and sentence, defendant argued that Supreme Court denied him a fair trial by refusing to charge the jury on the inaccuracy of cross-racial identification.

The Appellate Division modified the judgment, as to the sentence, and affirmed as modified, holding that Supreme Court had not erred in declining to instruct the jury on cross-racial identification (129 AD3d 1099 [2d Dept 2015]).  The Appellate Division reasoned that defendant had not "placed the issue in evidence during the trial" (id. at 1099-1100).

A Judge of this Court granted defendant leave to appeal from so much of the Appellate Division's order as affirmed Supreme Court's judgment (26 NY3d 1086 [2015]), and we now reverse.

### III.

Mistaken eyewitness identifications are "the single greatest cause of wrongful convictions in this country" (State v Delgado, 188 NJ 48, 60 [2006], citing State v Dubose, 285 Wis 2d 143, 162-163 [2005]), "responsible for more . . . wrongful convictions than all other causes combined" (Gary L. Wells et al., Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads, 22 L & Human Behav 603, 604 [1998]). Inaccurate identifications, especially misidentifications by a single eyewitness, play a role in the vast majority of

post-conviction DNA-based exonerations in the United States.
Indeed, a recent report by the National Academy of Sciences
concluded that "at least one mistaken eyewitness identification
was present in almost three-quarters" of DNA exonerations
(Identifying the Culprit: Assessing Eyewitness Identification 11
[2014]).  According to amicus The Innocence Project, 71% of DNA
exonerations nationally involve eyewitness misidentification
(Innocence Project, DNA Exonerations in the United States,
https://www.innocenceproject.org/dna-exonerations-in-the-united-
states [last accessed December 1, 2017]).  This Court has noted
in recent years the prevalence of eyewitness misidentifications
in wrongful convictions and the danger they pose to the truth-
seeking function and integrity of our justice system (see People
v Marshall, 26 NY3d 495, 502 [2015]; People v Santiago, 17 NY3d
661, 669 [2011]; see also e.g. People v Riley, 70 NY2d 523, 531
[1987]; People v Caserta, 19 NY2d 18, 21 [1966]).

Social scientists have found that the likelihood of
misidentification is higher when an identification is
cross-racial.  Generally, people have significantly greater
difficulty accurately identifying members of other races than
members of their own race.  According to a meta-analysis of 39
psychological studies of the phenomenon, participants were "1.56
times more likely to falsely identify a novel other-race face
when compared with performance on own-race faces" (C.A. Meissner
& J.C. Brigham, Thirty years of investigating the other-race

effect in memory for faces: A meta-analytic review, 7 Psychology,
Public Policy, and Law 3, 15 [2001]).  The phenomenon is known as
the cross-race effect or own-race bias.

Our trial level courts have recognized the general
scientific acceptance of the cross-race effect (see e.g. People v
Norstrand, 35 Misc 3d 367 [Sup Ct, Monroe County 2011]; People v
Williams, 14 Misc 3d 571 [Sup Ct, Kings County 2006]; People v
Radcliffe, 196 Misc 2d 381 [Sup Ct, Bronx County 2003], affd 23
AD3d 301 [1st Dept 2005]).  This Court too has had occasion to
observe the significance of the effect.  In People v Abney (13
NY3d 251 [2009]), we held that a trial court erred in refusing,
without the benefit of a Frye hearing, to allow an expert witness
to testify on cross-racial identification and other factors
affecting accuracy of identification (see id. at 268; see also
People v LeGrand, 8 NY3d 449, 454 [2007]).

The cross-race effect is "generally accepted" by
experts in the fields of cognitive and social psychology
(Identifying the Culprit at 96), a point that the People do not
dispute.  Indeed, in a survey of psychologists with expertise in
eyewitness identification, 90% of the experts believed that
empirical evidence of the cross-race effect was sufficiently
reliable to be presented in court (see John C. Brigham et al.,
The Influence of Race on Eyewitness Memory in Rod C.L. Lindsey et
al., Handbook of Eyewitness Psychology 258 [2014], citing S.M.
Kassin et al., On the "General Acceptance" of eyewitness

testimony research: A new survey of the experts, 56 American
Psychologist 405 [2001]).  The phenomenon has been described as
"[o]ne of the best documented examples of face recognition
errors" (S.G. Young et al., Perception and Motivation in Face
Recognition: A Critical Review of Theories of the Cross-Race
Effect, 16 Personality & Social Psychology Rev 116, 116 [2012]).

There is, however, a significant disparity between what
the psychological research shows and what uninstructed jurors
believe.  One study showed that only 47% of jurors were familiar
with the cross-race effect (see Tanja R. Benton et al.,
Eyewitness Memory is Still Not Common Sense: Comparing Jurors,
Judges and Law Enforcement to Eyewitness Experts, 20 Applied
Cognitive Psychology 115 [2006]).  A survey of over 1,000 jurors
in Washington, D.C., cited by amicus the American Psychological
Association, found that "[a] large plurality of the survey
respondents (48%) thought cross-race and same-race
identifications are of equal reliability, and many of the other
[survey] respondents either did not know or thought a
cross-racial identification would be more reliable (11%).  Only
36% of the survey respondents understand that a cross-racial
identification may be less reliable" (Richard S. Schmechel et
al., Beyond the Ken? Testing Jurors' Understanding of Eyewitness
Reliability Evidence, 46 Jurimetrics J 177, 200 [2006]).  These
findings demonstrate that, while the cross-race effect is a
matter of common sense and experience for some jurors, it is by

no means a universal belief shared by all.  The need for a charge on the cross-race effect is evident.  The question becomes how this instruction is best given.

IV.

As to each crime of which he was convicted, defendant, who is black, was found guilty entirely on the basis of the testimony of a single white witness identifying defendant as the person who had robbed him.  Nevertheless, Supreme Court refused to give the requested charge instructing the jury on the relative inaccuracy of cross-racial identifications.  One of Supreme Court's reasons for refusing to give the charge was that such an instruction should not be given if there has been no expert testimony on the subject.  We reject this rationale and hold that Supreme Court erred in relying on it.  For this reason and because the error was not harmless, we reverse.

Expert testimony on the cross-race effect is not a precondition of a jury charge on the subject.  Indeed, the People do not contend that it is, but instead insist, at least in this appeal, that expert testimony on the cross-race effect is a preferable substitute for a jury charge and one that renders the charge superfluous.  We disagree.

The decision to grant a request for expert testimony on the subject of cross-racial identification remains within the trial court's discretion (see LeGrand, 8 NY3d at 455-456; People v Young, 7 NY3d 40, 44 [2006]; People v Lee, 96 NY2d 157, 160

[2001]).  However, expert testimony is not necessary to establish
the right to the charge.

A psychological principle such as the cross-race
effect may lend itself to expert testimony.  "Despite the fact
that jurors may be familiar from their own experience with
factors relevant to the reliability of eyewitness observation and
identification, it cannot be said that psychological studies
regarding the accuracy of an identification are within the ken of
the typical juror" (Lee, 96 NY2d at 162; see also Santiago, 17
NY3d at 672; Abney, 13 NY3d at 268; LeGrand, 8 NY3d at 458).
Contrary to the People's position, this does not mean that the
cross-race effect cannot be expressed in a jury charge.

We have recognized that the same psychological
principle may be the subject of expert testimony and a jury
charge.  For example, the pattern jury instructions ask jurors to
consider "[f]or what period of time . . . the witness actually
observe[d] the perpetrator" (CJI 2d [NY] Identification [One
Witness]; CJI 2d [NY] Identification [Witness Plus]), because
exposure time, the amount of time a witness has to view a
perpetrator, affects that person's ability to identify someone
accurately as the perpetrator.  Yet, we have held that a trial
court abused its discretion in refusing to hold a Frye hearing
with regard to an expert's proposed testimony on the effect of
exposure time, among other factors (see Abney, 13 NY3d at 268;

see also Santiago, 17 NY3d at 672).[1]

Similarly, as noted above, a juror may have a tentative belief, based on his or her ordinary experiences, that cross-racial identifications are often inaccurate, but most jurors will have no knowledge of the research demonstrating the cross-race effect. Expert testimony explaining the studies to the jury is admissible, because "it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror" (De Long v County of Erie, 60 NY2d 296, 307 [1983]), with the decision to admit subject to the trial court's discretion (see LeGrand, 8 NY3d at 455-456). Such expert testimony does not render a charge regarding the cross-race effect superfluous.

In short, the absence of expert testimony on cross-racial identification does not preclude the charge.

V.

Supreme Court also erred in assuming that a cross-racial identification charge should be predicated on whether defense counsel cross-examined the People's witnesses about their identifications. An eyewitness is often utterly confident about an identification, expressing the identification

---

[1] For these reasons, our requirement of a jury charge on cross-racial identification, far from "threaten[ing] the viability of expert testimony on the cross-race effect" (concurring op at 14), is fully consistent with the admission of expert testimony on the science establishing the cross-race effect.

or recollection of identification with subjective certainty, and hence entirely unshakable on cross-examination.  "[A]s scholars have cautioned, most eyewitnesses think they are telling the truth even when their testimony is inaccurate, and because the eyewitness is testifying honestly (i.e., sincerely), he or she will not display the demeanor of the dishonest or biased witness. Instead, some mistaken eyewitnesses, at least by the time they testify at trial, exude supreme confidence in their identifications" (State v Henderson, 208 NJ 208, 236 [2011] [internal quotation marks, square brackets, and citation omitted]; see Jules Epstein, The Great Engine that Couldn't: Science, Mistaken Identity, and the Limits of Cross-Examination, 36 Stetson L Rev 727, 772 [2007]).  Honesty and accuracy are entirely different categories by which jurors evaluate testimony. It is the fact of a cross-racial identification that should be the basis of the court's charge, not the nature of the questions asked on the examination.

        Amici former judges and prosecutors observe that cross-examination that is "aimed at establishing that a witness may have difficulty identifying members of another race may offend the witness and the jury, without any benefit to the examiner" (Brief of Former Judges and Prosecutors as Amici Curiae at 8, citing Epstein at 775).  The amici note that "[a]s a society, we do not discuss racial issues easily.  Some jurors may deny the existence of the cross-race effect in the misguided

belief that it is merely a racist myth . . . while others may believe in the reality of this effect but be reluctant to discuss it in deliberations for fear of being seen as bigots.  That, however, makes an instruction all the more essential" (Brief of Former Judges and Prosecutors at 15 [internal quotation marks, citations, and square brackets omitted]).  As with whether to seek expert testimony, cross-examination should be a decision that counsel makes within the context of an individual case.

VI.

High courts in other states have recently considered the significance of the cross-race effect and three have required that trial courts, in appropriate cases, instruct juries regarding the phenomenon.

In 2011, in State v Henderson (208 NJ 208), the Supreme Court of New Jersey held that a cross-racial identification charge (to be drafted by the state Criminal Practice Committee and Committee on Model Criminal Jury Charges) must be given "whenever cross-racial identification is in issue at trial" (id. at 299 [2011]).[2]  The high court adopted the findings of a Special Master, appointed to evaluate scientific and other

_____

[2] Earlier, the Supreme Court of New Jersey had held in State v Cromedy (158 NJ 112 [1999]) that a charge regarding the relative inaccuracy of cross-racial identification "should be given only when . . . identification is a critical issue in the case, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability" (Cromedy, 158 NJ at 132).

evidence about eyewitness identifications, who had heard testimony by seven experts and issued an extensive report. The court "anticipate[d] . . . that with enhanced jury instructions, there will be less need for expert testimony. Jury charges offer a number of advantages: they are focused and concise, authoritative (in that juries hear them from the trial judge, not a witness called by one side), and cost-free; they avoid possible confusion to jurors created by dueling experts; and they eliminate the risk of an expert invading the jury's role or opining on an eyewitness' credibility" (id. at 298).

The following year, the Supreme Court of Hawaii held that trial courts in criminal cases "must give the jury a specific eyewitness identification instruction whenever identification evidence is a central issue in the case, and it is requested by the defendant" (State v Cabagbag, 127 Haw 302, 304 [2012]), including an instruction that one factor to be considered in evaluating identification testimony is the cross-racial nature of an identification (see id. at 314).

In Commonwealth v Bastaldo (472 Mass 16 [2015]),[3] the Supreme Judicial Court of Massachusetts, relying on the Report and Recommendations of the Supreme Judicial Court Study Group on

---

[3] In Commonwealth v Gomes (470 Mass 352 [2015]), the same court had included an instruction on cross-racial identification in a provisional model jury instruction that the court required to be given, where appropriate, in trials commencing after the issuance of that opinion (see id. at 382 [Appendix]).

Eyewitness Evidence, held that in light of the fact that "the existence of the 'cross-race effect' . . . has reached a near consensus in the relevant scientific community and has been recognized by courts and scholars alike" (id. at 23), an instruction on the inaccuracy of cross-racial identification must be given, unless the parties agree that there was no cross-racial identification.

> "[I]n criminal trials that commence after the issuance of this opinion, the following instruction should be included when giving the model eyewitness identification instruction, unless all parties agree to its omission: 'If the witness and the person identified appear to be of different races, you should consider that people may have greater difficulty in accurately identifying someone of a different race than someone of their own race'" (id. at 27).

Defendant urges this Court to require that a jury charge on the cross-race effect be given in all cases unless both parties agree that no cross-racial identification has occurred, or, alternatively, when requested by defense counsel.

VII.

In February 2011, the New York State Justice Task Force[4] published Recommendations for Improving Eyewitness Identifications. Under the heading of Pattern Jury Instructions, the Justice Task Force endorsed the substance of the existing

---

[4] The Justice Task Force was created in 2009 to address wrongful convictions in our State and make recommendations for changes to the criminal justice system to safeguard against such convictions.

pattern Criminal Jury Instructions regarding eyewitness

identification (see CJI 2d [NY] Identification [One Witness]; CJI

2d [NY] Identification [Witness Plus]), and further recommended

"that the jury instructions be revised to include an instruction

on cross-racial identifications in cases in which cross-racial

identification is an issue" (New York State Justice Task Force,

Recommendations for Improving Eyewitness Identifications at 5).

The Justice Task Force suggested the following instruction:

> "If you think it is appropriate to do so, you
> may consider whether the fact that the
> defendant is of a different race than the
> witness has affected the accuracy of the
> witness' original perception or the accuracy
> of a later identification.  You should
> consider that some people may have greater
> difficulty in accurately identifying members
> of a different race than in identifying
> members of their own race" (id.).

The Task Force added that "[t]his instruction should be

given in cases in which cross-racial identification is an issue,

regardless of whether an expert testifies on the topic of

cross-racial identification" (id.).

In the same year, the authors of the Criminal Jury

Instructions amended the pattern jury instructions for

identification, so as to include the following model charge on

cross-racial identification:

> "You may consider whether there is a
> difference in race between the defendant and
> the witness who identified the defendant, and
> if so, whether that difference affected the
> accuracy of the witness's identification.
> Ordinary human experience indicates that some
> people have greater difficulty in accurately

identifying members of a different race than
they do in identifying members of their own
race.  With respect to this issue, you may
consider the nature and extent of the
witness's contacts with members of the
defendant's race and whether such contacts,
or lack thereof, affected the accuracy of the
witness's identification. . . ."  (CJI 2d
[NY] Identification [One Witness]; CJI 2d
[NY] Identification [Witness Plus]).[5]

We note that, unlike the Massachusetts Supreme Judicial
Court, our Justice Task Force does not suggest that the
instruction should always be given unless the parties agree to
its omission.  Neither do the authors of the Criminal Jury
Instructions.

VIII.

In light of our discussion of the cross-race effect,
which has been accepted by a near consensus in the relevant
scientific community of cognitive and social psychologists, and
recognizing the very significant part that inaccurate
identifications play in wrongful convictions, we reach the
following holding: in a case in which a witness's identification
of the defendant is at issue, and the identifying witness and
defendant appear to be of different races, a trial court is

---

[5] The CJI drafters noted that "[b]oth the American Bar
Association and the New York State Justice Task Force have
recommended that, if in issue, there should be a charge on
cross-racial identification. . . .  Both the ABA and the Task
Force recommend that an instruction be given regardless of
whether an expert testifies on the topic of cross-racial
identification" (CJI 2d [NY] Identification [One Witness], n 7;
CJI 2d [NY] Identification [Witness Plus], n 6).

required to give, upon request, during final instructions, a jury charge on the cross-race effect, instructing (1) that the jury should consider whether there is a difference in race between the defendant and the witness who identified the defendant, and (2) that, if so, the jury should consider (a) that some people have greater difficulty in accurately identifying members of a different race than in accurately identifying members of their own race and (b) whether the difference in race affected the accuracy of the witness's identification.  The instruction would not be required when there is no dispute about the identity of the perpetrator nor would it be obligatory when no party asks for the charge.[6]

IX.

The People rely on People v Whalen (59 NY2d 273 [1983])

---

[6] Contrary to the concurrence, we do not require trial courts "to give a cross-racial identification charge without regard for the facts and circumstances of each case" (concurring op at 12).  A trial judge may decide as a matter of law that identification is not at issue where "there is no risk of misidentification" (People v Boyer, 6 NY3d 427, 431-432 [2006]).  However, a trial judge may not decide the purely factual question of whether a crime was so "prolonged" and a witness's exposure to the perpetrator so extended that the witness would have adequately learned the perpetrator's features so as to be able to recognize him accurately.  It is the jury's task "to examine and evaluate the many factors upon which the accuracy of [identification] testimony turns including, among others, the . . . opportunity and capacity to observe and remember the physical characteristics of the perpetrator at the time of the crime" (People v Ruffino, 110 AD2d 198, 201 [2d Dept 1985]; see also Perry v New Hampshire, 565 US 228, 245-47 [2012]).  A judge should not engage in a weight analysis as to the quantitative degree of risk of misidentification at this threshold stage.

and People v Knight (87 NY2d 873 [1995]) for the proposition that
a trial court's determination whether to give an identification
charge is always "a matter for the Trial Judge's discretion"
(Knight, 87 NY2d at 874; see Whalen, 59 NY2d at 279), provided
that the trial court conveys to the jury that the People have to
establish the perpetrator's identity beyond a reasonable doubt
(see Whalen, 59 NY2d at 279; Knight, 87 NY2d at 874).

        In Whalen, which did not involve the cross-race effect,
defendant asked for "an expansive charge on identification
testimony that would emphasize its unreliability and the close
scrutiny that should be given to such evidence," and the trial
court "declined to grant the request, instead delivering a
minimal instruction that the prosecutor had the burden of proving
identification beyond a reasonable doubt" (id. at 277-278).  The
Court of Appeals, while reversing on other grounds, ruled that
there was no error in the trial court's refusal.  "A Judge who
gives a general instruction on weighing witnesses' credibility
and who states that identification must be proven beyond a
reasonable doubt has made an accurate statement of the law" (id.
at 279).  Although the disposition of the case did not make such
analysis necessary, the Court expressly insisted "that the better
practice is to grant a defendant's request and give the expanded
charge" (id.).

        Inasmuch as Supreme Court in the case before us today
gave the jury an expanded charge on eyewitness identification,

albeit omitting the requested cross-racial identification instruction, we have no occasion to decide under what circumstances it would be error not to give the expanded charge (or any component thereof other than a charge on the cross-race effect). Neither the parties nor the amici in this case contend that trial courts have ignored or discounted the "better practice" that we urged trial courts to adopt in Whalen in 1983. We assume that, when identification is in issue and an expanded charge on identification is requested, trial courts, exercising their discretion, regularly give an instruction based on the pattern charges CJI 2d (NY) Identification (One Witness) or CJI 2d (NY) Identification (Witness Plus), telling the jury to examine and evaluate the various factors upon which the accuracy of identification depends.

The Whalen Court stressed its concern with "[t]he potential for inaccuracy in visual identification evidence" (Whalen, 59 NY2d at 278), and that concern underpins our decision here. Moreover, no charge on cross-racial identification was at issue in Whalen or Knight. These precedents do not directly conflict with our decision today, and we leave in place their approach to eyewitness identification charges in general: whether to give the charge is discretionary, but it is better practice to grant defendant's request for such a charge.

In the matter of the cross-race effect, however, the recent developments in the understanding of wrongful convictions

and cross-racial eyewitness identifications described above demand a new approach.  Whether a jury charge on the cross-race effect is appropriate in an individual case is therefore not subject to the approach set out in <u>Whalen</u> and <u>Knight</u>.

X.

The People's remaining arguments, including that defendant did not preserve or abandoned his request for a cross-racial identification charge and that any error was harmless, are without merit.

Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

People v Otis Boone

No. 55

GARCIA, J.(concurring in result):

Eyewitness identifications present powerful and highly probative evidence of a defendant's guilt, and accordingly, mistaken eyewitness identifications pose a serious danger both "to defendants and to the integrity of our justice system" (People v Marshall, 26 NY3d 495, 502 [2015] [citations omitted]; see also United States v Wade, 388 US 218, 228 [1967]). That said, "much eyewitness identification testimony is reliable and is, and should be, routinely accepted by juries" (Young v Conway, 698 F3d 69, 80 [2d Cir 2012]; see also People v Santiago, 17 NY3d 661, 671 [2011]). Our trial courts are entrusted to employ various safeguards -- including pretrial review of identification procedures, expert testimony, and jury instructions -- to shield jurors from unreliable evidence and to guide them in assessing the accuracy of an identification. Having presided over the proceedings, and having heard the evidence and the arguments, the trial court is best situated to appropriately assist the jury in assessing the accuracy of an identification. We have therefore held that, as with most jury instructions, a defendant's request for a particular charge on eyewitness identification testimony is "a matter for the Trial Judge's discretion" (People v Knight, 87

- 1 -

NY2d 873, 874 [1995]).

Critical to the sound exercise of that discretion is clear guidance regarding its parameters. Today, the majority advances a new rule that purports to "require[]" a cross-racial identification charge upon request, while vaguely suggesting that the trial court retains some undefined discretion to deny the charge where, for instance, identification is not "at issue" (majority op at 16-17). This illusion of discretion does a disservice to trial judges, who are tasked with implementing the majority's apparently mandatory rule while facing the harsh remedy of automatic error.

Under the circumstances of this case, I agree that the trial court abused its discretion in denying defendant's request for a cross-racial identification charge. I write separately because I would reaffirm, in no uncertain terms, the longstanding principle that the decision to deliver a cross-racial identification charge -- like any other identification charge -- remains in the sound discretion of the trial court.

I.

Defendant Otis Boone was charged with two counts of robbery in the first degree based on two separate incidents. The victim of the first robbery alleged that the assailant approached him on the street, grabbed his cell phone, and fled. The victim began chasing the assailant, but stopped when the assailant turned around and wielded a knife. The robbery lasted

approximately one minute.  Shortly thereafter, the victim canvassed the area with police officers and reviewed approximately two hundred mugshots, but he did not recognize the assailant.

The second victim similarly alleged that the assailant approached him on the street and attempted to grab his cell phone.  When the victim held onto the phone, the assailant stabbed him in the back and fled.  The second robbery lasted less than one minute.  While on the way to the hospital, police officers stopped the ambulance to show the victim an individual who matched his earlier description.  The victim told officers that the individual was not the assailant.

The two victims subsequently identified defendant in separate lineups.  Defendant was arrested and eventually proceeded to trial.

After the close of the evidence, during the charge conference, defense counsel requested a cross-racial identification charge, noting that "identifications were made by white males of a black male."  The trial court declined defendant's request, stating:

> "I am familiar with the [LeGrand] case and
> its progeny, but there was no testimony
> before this jury regarding any cross-racial
> identification issues.  There is no evidence
> before this jury regarding the, we say, a
> lack of reliability of cross-racial
> identification.  There was no expert
> testimony to that effect."

During summation, defense counsel argued that the victims had

mistakenly identified defendant.

The jury convicted defendant of two counts of robbery in the first degree.  The Appellate Division unanimously modified by reducing defendant's sentence, but otherwise affirmed the judgment of conviction (129 AD3d 1099 [2d Dept 2015]).  A Judge of this Court granted defendant leave to appeal (26 NY3d 1086 [2015]).  On appeal, defendant contends that the trial court deprived him of a fair trial by denying his request for a cross-racial identification charge.

II.

A number of safeguards are "built into our adversary system" to "caution juries against placing undue weight on eyewitness testimony of questionable reliability" (Perry v New Hampshire, 565 US 228, 245 [2012]).  For instance, defendants are entitled to challenge eyewitness identifications in advance of trial pursuant to a "statutory scheme" designed to "ensure[] that [] identifications are not the product of undue suggestiveness and lessen[] the possibility of misidentification" (People v Boyer, 6 NY3d 427, 431 [2007]; see also CPL 710.30).  If an identification procedure is deemed unduly suggestive, the trial court must ensure that any subsequent identification rests on the witness's independent recollection, rather than a prior tainted procedure (Wade, 388 US at 239-42).

Trial courts also assess the threshold admissibility of identification evidence and may, in their discretion, "exclude

relevant evidence if its probative value is outweighed by the prospect of trial delay, undue prejudice to the opposing party, confusing the issues or misleading the jury" (People v Primo, 96 NY2d 351, 355 [2001] [citations omitted]).  In addition, defendants are entitled to "the effective assistance of an attorney, who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments" (Perry, 565 US at 246).

Trial courts may also offer the jury "guidance regarding how to assess the reliability of an identification" (People v LeGrand, 8 NY3d 449, 454 [2007]).  For instance, trial courts are "encouraged, in appropriate cases," to admit "expert testimony on the subject of eyewitness recognition memory" (Santiago, 17 NY3d at 669, citing People v Drake, 7 NY3d 28, 31 [2011] [quotation marks omitted]).  Trial courts may further "address the dangers of unreliable eyewitness identification testimony by giving a jury charge appropriate to the circumstances of the case" (Young, 698 F3d at 79-80 [citation and quotation marks omitted]).  Each of these measures serves to protect criminal defendants against the dangers associated with unreliable eyewitness identification evidence.

## III.

Equipped with these safeguards, our trial courts are entrusted to police the admission of identification evidence and,

where appropriate, to educate the jury on how to properly scrutinize the reliability of eyewitness testimony.  Trial courts are best situated to strike the proper balance, giving due consideration to both "the importance [and] the fallibility of eyewitness identifications" (Perry, 565 US at 245).

A.

In particular, the responsibility of assessing whether and how to "communicate to jurors the factors that may affect the validity of eyewitness testimony and support a more sensitive discrimination of . . . eyewitness testimony in individual cases" belongs in the hands of our trial courts (Identifying the Culprit: Assessing Eyewitness Identification, The National Academies Press 43 [2014]).  As a general matter, "tailoring jury instructions to ensure that the case is submitted to the jury in a full and fair manner is a quintessential task of the trial court" (United States v McKnight, 665 F3d 786, 792 [7th Cir 2011]; see also Young, 698 F3d at 79-80).  In connection with its "nondelegable judicial responsibility" to supervise deliberations (People v Bayes, 78 NY2d 546, 551 [1991]), the trial court maintains exclusive control over jury instructions -- a "critical judicial function" (People v Brown, 104 AD3d 864, 865 [2d Dept 2013]; see also CPL 300.10).  "The judicial officer who presides over the entire trial proceedings, observes the witnesses, hears the substance and tone of counsels' arguments and both watches and assesses the jury's reaction is in the best position to

determine the need for, and the scope of, any cautionary instructions with respect to the evidence" (McKnight, 665 F3d at 792).

In addition, while the cross-race effect itself has reached general scientific acceptance (see majority op at 6-7), studies concerning "the effectiveness of jury instructions on assessment of eyewitness identification evidence" have yielded "mixed" findings (Identifying the Culprit at 43). Trial courts therefore employ a critical gatekeeping role in shielding the jury from instructions that are misleading, irrelevant, or otherwise unwarranted. At minimum, "[m]ore research is warranted" in order to "better understand" how best to inform jurors of the complexities of eyewitness identifications (Identifying the Culprit at 43), counseling in favor of a measured approach that allows trial courts to accommodate ongoing scientific developments regarding identification evidence, the cross-race effect, and juror comprehension.[1]

B.

For more than thirty years, we have reaffirmed the principle that whether a particular identification charge "is

---

[1] The majority asserts that the cross-race effect is "a matter of common sense and experience," yet simultaneously contends that there is a "significant disparity between what the psychological research shows and what uninstructed jurors believe" (majority op at 7). This confusion further reinforces the notion that trial courts should retain the latitude to assess how to advise jurors to properly scrutinize eyewitness identification evidence.

appropriate in an individual case" is "a matter for the Trial Judge's discretion" (People v Knight, 87 NY2d 873, 874 [1995]), even if the science underlying the requested charge "is well known to the legal community" (People v Whalen, 59 NY2d 273, 278 [1983] [citations omitted]).

In People v Whalen, the defendant asserted a mistaken identity defense at trial and "requested an expansive charge on identification testimony that would emphasize its unreliability and the close scrutiny that should be given to such evidence" (Whalen, 59 NY2d at 277-278).  The trial court declined the defendant's request, "instead delivering a minimal instruction that the prosecutor had the burden of proving identification beyond a reasonable doubt" (id. at 278).  The defendant later challenged his conviction, arguing that "the court's refusal to give the expansive identification instruction was error" (id.).  This Court rejected the defendant's claim.  While noting that "[t]he potential for inaccuracy in visual identification evidence is well known to the legal community" -- and suggesting that the "better practice" is to "give the expanded charge" -- the Court nonetheless determined that "no error occurred" (id. at 278-279 [citations omitted]).

More than a decade later, in People v Knight, the Court again concluded that whether an expanded identification charge "is appropriate in an individual case" is "a matter for the Trial Judge's discretion" (Knight, 87 NY2d at 874).  There, as in

Whalen, the defendant had asserted a mistaken identity defense at trial and, on appeal, argued that the trial court erred in failing to give an expanded identification charge (id.). The Court rejected the defendant's challenge, reasoning that "[t]he court's charge was a correct statement of the law" and that there was "little possibility that the failure to expand the charge on identification infected the trial with error" (id. at 874-875 [citations omitted]).

As the majority notes, there is no indication that "trial courts have ignored or discounted the 'better practice' that we urged trial courts to adopt" when exercising their discretion (majority op at 19, citing Whalen). Accordingly, until today, both Whalen and Knight remained good law.

                                IV.

Proclaiming that cross-racial identification issues nonetheless "demand[] a new approach," the majority dictates that trial courts are now "*required* to give, upon request, during final instructions, a jury charge on the cross-race effect" (majority op at 2, 17 [emphasis added]). But the majority hedges. Seemingly aware of the countless implications accompanying a mandatory charge, the majority provides that trial courts may deny the charge where (1) the identifying witness and defendant do not "appear to be of different races," or (2) the witness's identification of the defendant is not "at issue" (majority op at 17).

On paper, those purported caveats remain undefined and unexplained.  In practice, they are meaningless.  As a result, trial courts will now be "*required* to give" a prescribed "jury charge on the cross-race effect" (majority op at 17 [emphasis added]), regardless of whether cross-racial identification issues are implicated at trial.  Not only is this approach unprecedented -- we do not mandate any other charge relating to identification evidence -- it inhibits our trial courts in a manner that may frustrate jury deliberations.

### A.

With regard to the first exception, the majority states that the charge is required only where the identifying witness and defendant "appear to be" of different races, yet instructs that "*the jury* should consider whether there is a difference in race between the defendant and the witness who identified the defendant" (majority op at 16-17 [emphasis added]).  To the extent that determination is for the trial court, the majority gives no guidance to those judges tasked with implementing this new cross-racial assessment.  To the extent the majority leaves that determination to the jury, the charge effectively becomes mandatory: it will be required even where, as a factual matter, an identification was not cross-racial.

The second, and more vague, threshold determination requires the trial court to consider whether the witness's identification of the defendant is "at issue."  To the extent the

majority implies that the trial judge may, based on all the facts and circumstances, decide as a threshold matter that identity is not "at issue" -- and deny the charge on that basis -- that is simply discretion by another name, contorted into a "mandatory" rule imbued with discretionary exceptions, and carrying the threat of per se error.  But the majority provides no clear guidance as to how that threshold determination should be made.

In a footnote, the majority borrows language from People v Boyer, apparently crafting a "confirmatory identification" exception where the trial court determines that "there is no risk of misidentification" (majority op at 17, citing People v Boyer, 6 NY3d 427, 431-432 [2006]).  That "confirmatory identification" exception applies where "the protagonists are known to one another" or where "the witness knows the defendant so well as to be impervious to police suggestion" (People v Rodriguez, 79 NY2d 445, 452 [1992]; see also Boyer, 6 NY3d at 431-432, citing Rodriguez, 79 NY2d at 453). It can apply, for instance, to a "store clerk" who has "seen a customer 'four dozen' times" (Rodriguez, 79 NY2d at 450), or to a lookout's "relatively brief" but "intense" viewing of a perpetrator (People v Breland, 83 NY2d 286, 295 [1994]).

But that is emphatically *not* what the majority intends: "a trial judge may *not* decide the purely factual question of whether a crime was so 'prolonged' and a witness's exposure to the perpetrator so extended that the witness would have

adequately learned the perpetrator's features so as to be able to recognize him accurately" (majority op at 17-18 [emphasis added]).  Seemingly, a perfunctory claim that identity is "at issue" is adequate to warrant the charge, even where there is no genuine "risk of misidentification," or even where the defendant is not asserting a genuine misidentification defense.  Under that rule, trial courts are required to give a cross-racial identification charge without regard for the facts and circumstances of each case -- including where "the witness is so familiar with the defendant" that the identification is merely "confirmatory" (Rodriguez, 79 NY2d at 450 [1992]).[2]  The charge is then required where a complainant is victimized by a close friend or family member, including in trials involving domestic violence or child abuse.  It is also required in cases of prolonged kidnapping or unlawful imprisonment, where the victim's extended exposure to the perpetrator effectively eliminates any risk of misidentification.  These fact-intensive, discretionary determinations are properly resolved as a threshold matter by trial judges, who are best-situated to assess the particular circumstances and needs of each case (see e.g. People v Petty, 7 NY3d 277, 284 [2006] [trial court determines whether any

---

    [2] Even defendant and his amici acknowledge that a cross-racial identification charge is unwarranted in the context of confirmatory identifications (see Brief of Former Judges and Prosecutors as Amici Curiae at 10 n 3 [noting that a mandatory rule should "exclude 'confirmatory identifications'"], citing People v Rodriguez, 79 NY2d 445, 449-452 [1992]).

reasonable view of the evidence supports a justification defense charge]; People v Gonzalez, 68 NY2d 424, 430 [1986] [trial court makes threshold determination as to whether missing witness charge is warranted]).

Handed only those nebulous caveats, our trial courts are left with one option:  administer the charge, upon request, in each and every case.  Consequently, the majority's rule effectively eliminates any trial court discretion, mandating a cross-racial identification charge in every criminal trial where it is requested.

In stripping trial courts of their discretion, the majority's rule presumes that our trial courts are incapable of performing their "quintessential task[s]" (McKnight, 665 F3d 792).  It also overcorrects: the rule requires a cross-racial identification charge to be given even where it is likely to confuse, distract, or mislead the jury.  Mandating the charge -- even in cases where it is misleading, irrelevant, or otherwise unwarranted -- creates a substantial risk of juror confusion and serves only to hinder, rather than aid, the jury's critical factfinding function.  In this way, the majority's overinclusive, mandatory-on-request approach needlessly undermines the reliability of valid identification evidence to the detriment of both victims and jurors.

B.

A mandatory rule also fundamentally undermines the

central holding of <u>Whalen</u> and <u>Knight</u>: that whether to give a particular identification charge is "a matter for the Trial Judge's discretion" (<u>Knight</u>, 87 NY2d at 874).[3]  This monumental shift in our law not only erodes the critical authority of our trial courts, it may also alter the legal landscape in a number of predictable and unforeseeable ways.

It is unclear, for instance, whether the majority's reasoning extends to similar jury charges, thereby mandating the introduction of other scientific principles by instruction regardless of whether those principles are implicated at trial. The majority's rule also threatens the viability of expert testimony on the cross-race effect, which is permissible only where the topic is "beyond the ken of the average juror" (<u>People v Abney</u>, 13 NY3d 251, 268 [2009]) -- not where it is "a matter of common sense and experience" (majority op at 7).  A mandatory rule also spawns retroactivity issues, which carry serious and sweeping implications.  These ramifications, among others, highlight both the weight and breadth of such a sharp divergence from recent precedent.

---

[3] The majority purports to "leave in place" the holding of <u>Whalen</u> and <u>Knight</u> (majority op at 19).  Despite that assurance, the majority's approach -- explicitly eliminating any trial court discretion -- runs afoul of their central holding: that whether to give an expanded identification charge is "a matter for the Trial Judge's discretion" (<u>Knight</u>, 87 NY2d at 874).  As the cross-racial identification charge is a "component thereof," the majority's holding "directly conflict[s]" with <u>Whalen</u> and <u>Knight</u> (majority op at 19).

C.

Recognizing these concerns, in 2011, the New York State Justice Task Force promulgated its "Recommendations for Improving Eyewitness Identifications." In lieu of mandating a cross-racial identification charge, the Task Force recommended that the instruction should be included only "in cases in which cross-racial identification is an issue" (New York State Justice Task Force, Recommendations for Improving Eyewitness Identifications at 5). The ABA Criminal Justice Section similarly declined to recommend a "mandate that judges give a cross-racial jury instruction," and instead provided that "trial judges should have discretion to give an instruction in certain cases where there is a heightened risk of misidentification" (ABA Criminal Justice Section Report, at 3, 16 [2008]). The authors of the Criminal Jury Instructions went even further, noting that a cross-racial identification charge should only be given "if placed in issue by the evidence" (see CJI 2d [NY] Identification [One Witness]; CJI 2d [NY] Identification [Witness Plus]). And while a few jurisdictions have mandated the charge "whenever cross-racial identification is in issue at trial" (e.g. State v Henderson, 27 A3d 872, 926 [NJ 2011]; see also Commonweath v Bastaldo, 32 NE3d 873, 880 [Mass 2015]; State v Cabagbag, 277 P3d 1027, 1038-1039 [Haw 2012]), many more have opted to preserve the discretion of trial courts to assess whether -- and how -- to communicate to jurors the factors that may support a more sensitive evaluation

of eyewitness testimony (e.g. State v Allen, 294 P3d 679, 686 [Wash 2013]; Wallace v State, 701 SE2d 554, 557 [Ga App 2010]; see also United States v King, 751 F3d 1268, 1275-1276 [11th Cir 2014]; United States v Washam, 468 Fed Appx 568, 572 [6th Cir 2012]; United States v Suggs, 230 Fed Appx 175, 184-185 [3d Cir 2007]; United States v Strode, 229 F3d 1161, *2 [9th Cir 2000]).

D.

Despite its forceful new dictate, the majority curiously invokes the trial court's "discretion" in holding that expert testimony is not a precondition for a cross-racial identification charge (majority op at 8-10). Consistent with the trial court's broad discretion over jury instructions, I agree that expert evidence is not required before the court may charge the jury on cross-racial identification issues. While expert testimony may be an appropriate vehicle for educating jurors on the cross-race effect, the decision to admit or exclude expert evidence concerning eyewitness identification issues -- like the decision to instruct the jury on those issues -- is a discretionary one (People v Young, 7 NY3d 40, 44 [2006]) that is untethered to the court's decision to admit or exclude a particular jury charge.

* * *

The rule set out by the majority provides conflicting signals to our trial courts. On the one hand, it suggests some undefined discretion in considering a defendant's request for a

cross-racial identification charge.  But the majority's refusal to define that discretion -- or even to use the word -- signals a mandatory rule, complete with harsh consequences for the trial judge who does not realize it.  That confusion benefits no one.

As a result, the majority's approach will function as it was apparently intended: a mandatory charge.  This unprecedented approach is overinclusive, may be harmful to jurors, and suggests a lack of confidence in our State's trial judges.  It will also spur ramifications far beyond this case.

I do not share the majority's doubts in our trial courts' ability to appropriately tailor their jury instructions. I remain confident that our trial courts are well-equipped to discharge their gatekeeping role in a manner that promotes fairness and provides effective guidance to jurors.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed and a new trial ordered.  Opinion by Judge Fahey. Chief Judge DiFiore and Judges Rivera, Feinman and Tom concur. Judge Garcia concurs in result in an opinion, in which Judge Stein concurs.  Judge Wilson took no part.

Decided December 14, 2017