

# SUPREME COURT OF MISSOURI
# en banc

STATE OF MISSOURI,           )    *Opinion issued September 1, 2020*
                                      )
               Respondent,     )
                                      )
v.                                    )    No. SC98088
                                      )
KANE CARPENTER,         )
                                      )
                Appellant.       )

## APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
The Honorable Patricia S. Joyce, Judge

Kane Carpenter ("Carpenter") appeals his conviction after a jury trial on one count of robbery in the first degree. The case against him was largely, but not entirely, based on the identification provided by the victim at a "show up" that occurred only minutes after the crime occurred. Even though this identification was central to the state's case, the circuit court excluded expert witness testimony regarding various factors – including the suggestive nature of "show up" identifications – that can impact the reliability of eyewitness identifications. Because the circuit court erred in excluding this evidence, this Court vacates Carpenter's conviction and remands the case for a new trial.

## Background

On October 23, 2016, a young white man ("Victim") was walking west on Capitol Avenue in Jefferson City, Missouri, at approximately 7:45 in the evening. Victim was listening to music on wired earbuds connected to an iPhone in his pocket. It was dark, and the nearest street light was some distance away. Victim noticed he was being followed by two young black men wearing hoodies pulled low to obscure their faces. Because the two were closing quickly on Victim, he started to cross the street to put some distance between himself and them. The two black men stopped Victim in the middle of the street, one in front of him and one behind. The man in front asked Victim if he could use his phone. Victim said he did not have a phone and was listening to an iPod instead. The man in front pulled up his t-shirt, displaying what appeared to Victim to be the woodgrain handle of a .38 pistol tucked into his waistband, and said to Victim: "Give me what you have or I'll shoot you." He then took the iPhone and wired earbuds from Victim while the man behind Victim reached around and took the e-cigarette from Victim's hand and the nicotine cartridge from his pocket. The two then ran a short ways west on Capitol and turned south onto Lafayette. The entire encounter took less than one minute.

Victim pursued the two men down Lafayette and saw them cut through a residential yard to head east through an alley a half block south. Seeing a couple at the intersection of Lafayette and High Street, Victim ran past the alley down to High Street and asked to borrow their phone to report the robbery. Again, only seconds had passed since the crime occurred.

Victim's 911 call was received at 7:49 p.m. He said he had been robbed by two young black men, one in a black hoodie and one in a red hoodie. This description went out on the police radio at 7:50 p.m. Officers Fisher and Schuler (who was training Officer Fisher) were in their vehicle outside the police station when this call went out. They were only two or three blocks away and responded to Victim's location within seconds. Sergeant Lenart responded to the scene in a separate vehicle and quickly learned that Victim had last seen the two perpetrators running east in the alley between Lafayette and Cherry. Sergeant Lenart drove east to Cherry and turned north. He saw Carpenter and another young black man walking east across Cherry at the point where the alley crossed the street. Both were wearing t-shirts, and neither was wearing a hoodie. Sergeant Lenart stopped his vehicle, hailed the two, and asked if he could talk to them. Carpenter stopped immediately and, after taking a couple of steps suggesting he may run, the other young man stopped as well. It was 7:52 p.m.

Carpenter was standing next to a bush when Sergeant Lenart approached. Though Sergeant Lenart did not see Carpenter throw anything on the ground, he soon found an iPhone connected to wired earbuds lying on the ground six or seven feet from Carpenter on the other side of the bush. Carpenter was not carrying a gun and no gun was found in his vicinity. Officer Lehman arrived, exited his vehicle to join Sergeant Lenart, and noted that Carpenter appeared to be sweating and breathing heavily as if he had been running. Sergeant Lenart radioed Officers Fisher and Schuler to report that he had detained two young men nearby and request that Victim be brought to the location to see if he could identify them as the perpetrators.

3

At 7:54 p.m., Officers Fisher and Schuler received Sergeant Lenart's call and drove Victim the short distance to his location. On the way, Victim was told that he would see two men who may have been involved in the robbery and would be asked if he recognized them. He was admonished that these two were found in the area and generally matched the description he had given, but not to identify them as the perpetrators unless he was certain. When they arrived, Carpenter and the other young man were handcuffed and seated on the curb. Officer Fisher shone the spotlight on them. Without leaving the vehicle, Victim identified the two men as the ones who had robbed him and Carpenter, specifically, as the man who had displayed the pistol and threatened to shoot him. Victim noted Carpenter was not wearing the red hoodie he had been wearing during the robbery. Victim identified the iPhone as his and was able to enable it with his fingerprint in lieu of a password. Carpenter and the other man were arrested and removed from the scene.

Shortly thereafter, Sergeant Lenart and Officer Greenwalt began to search back from the location where Carpenter and the other man were arrested to the point where Victim had last seen them running away. Beginning at the point of where the two entered the alley from Lafayette, the officers found Victim's e-cigarette and the vial of nicotine. Both were broken and scattered. Further along the alley, the officers found a driver's license belonging to the young man who had been arrested with Carpenter. Just off the alley near Cherry Street, the officers found two hoodies, one black and one red. Several officers looked for, but were unable to find, the pistol or anything that Victim may have mistaken for a pistol.

4

Prior to trial, Carpenter's counsel served notice that he would call Dr. James Lampinen to testify at trial as an expert about the factors that can impact the reliability of eyewitness identifications generally. The state filed a motion to exclude this testimony on the ground that such expert testimony should not be admitted under *State v. Lawhorn*, 762 S.W.2d 820 (Mo. banc 1988), *State v. Whitmill*, 780 S.W.2d 45 (Mo. banc 1989), and subsequent cases. The circuit court granted the state's motion. To save time at trial, both parties and the court agreed Carpenter could make a proffer of Dr. Lampinen's testimony on the Friday before the Monday when trial would begin. At trial, Victim testified he was "one hundred percent certain" Carpenter was the one who threatened and robbed him. After the state rested its case, Carpenter's counsel sought to have Dr. Lampinen testify. The state renewed its objection based on *Lawhorn* and *Whitmill*, and the court sustained that objection and excluded the expert testimony.

Following the close of all the evidence, Carpenter tendered and the circuit court gave Instruction No. 9, which lists 17 factors the jury should consider in evaluating eyewitness identification evidence.[1] The jury found Carpenter guilty of robbery in the first degree. Carpenter appeals, arguing as his sole point that the circuit court erred in excluding Dr. Lampinen's testimony. This Court has jurisdiction over Carpenter's appeal under article V, section 10 of the Missouri Constitution.

---

[1] This instruction was based on MAI-CR 310.02, which this Court approved in 2015 and which is set forth in full and discussed at length in Section V of this opinion.

## Analysis

"A trial court enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal." *Cox v. Kan. City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015) (quotation omitted). Generally, a circuit court's decision will be considered an abuse of discretion when it is "clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* (citation omitted). However, when the parties fail to accurately inform the circuit court of the applicable law and this results in a ruling based upon an incorrect legal premise, the ruling is an abuse of discretion.

> A trial court can abuse its discretion through the inaccurate resolution of factual issues or through the application of incorrect legal principles. Where the facts are at issue, appellate courts extend substantial deference to trial court decisions. However, when the issue is primarily legal, no deference is warranted and appellate courts engage in de novo review.

*State v. Taylor*, 298 S.W.3d 482, 492 (Mo. banc 2009).

The state argued at trial that Dr. Lampinen's testimony should be excluded under *State v. Lawhorn*, 762 S.W.2d 820 (Mo. banc 1988), and subsequent cases. In *Lawhorn*, this Court affirmed the exclusion of expert testimony regarding certain factors impacting the reliability of eyewitness identifications. It began by noting that, "[g]enerally, expert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise ***be incapable*** of drawing a proper conclusion from the facts in evidence." *Id*. at 822 (emphasis added).

6

*See also State v. Taylor*, 663 S.W.2d 235, 239 (Mo. banc 1984) ("The rule in Missouri is that expert opinion testimony should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved." (quotation omitted)). The defendant in *Lawhorn* sought to offer expert evidence "to explain that research indicates the existence of 'the other race effect,' which causes persons to have difficulty identifying individuals of a different race, and that the effects of the passage of time, stress at the time of the crime, and the retrieval level in facial recognition memory of the human brain, all combine to diminish a witness' [sic] ability to make an accurate identification." *Lawhorn*, 762 S.W.2d at 823. This Court held the circuit court did not abuse its discretion in excluding this evidence because "such matters are within the general realm of common experience of members of a jury and can be evaluated without an expert's assistance." *Id*. In addition, this Court rejected the expert evidence because it would tend to distract the jury from the relevant issues and would, ultimately, invade the province of the jury, which alone must assess the credibility of each witness. *Id*. After *Lawhorn*, such evidence has routinely – if not uniformly – been excluded.

## I. *Lawhorn and its progeny were abrograted by § 490.065.2*

Carpenter argues that this Court should overrule *Lawhorn* due to the mounting scientific evidence on the subject gathered in the intervening decades. This is unnecessary, however, because *Lawhorn* and its progeny no longer control this issue. Those cases, which were decided as part of the common law of evidence in criminal

7

cases, were abrogated in 2017 by the enactment of section 490.065.2.[2]  This section, which now controls the admissibility of expert evidence in criminal cases, provides:

In all actions except those to which subsection 1 of this section[3] applies:

(1) A witness who is *qualified* as an expert by knowledge, skill, experience, training, or education may testify in the form of an *opinion or otherwise* if:

(a) The expert's scientific, technical, or other specialized knowledge *will help the trier of fact to understand the evidence or to determine a fact in issue*;

(b) The testimony is based on *sufficient facts* or data;

(c) The testimony is the product of *reliable principles* and methods; and

(d) The expert has *reliably applied* the principles and methods to the facts of the case;

(2) An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect;

(3)(a) An opinion is not objectionable just because it embraces an ultimate issue.

(b) In a criminal case, an expert witness shall not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone;

(4) Unless the court orders otherwise, an expert may state an opinion and give the reasons for it without first testifying to the underlying facts or

---

[2]  Unless otherwise stated, all statutory citations are to RSMo Supp. 2018.

[3]  Section 490.065.1 provides the test for admitting expert testimony in cases brought under chapter 451, 452, 453, 454, or 455 or in actions adjudicated in juvenile courts under chapter 211 or in family courts under chapter 487, or in all proceedings before the probate division of the circuit court, or in all actions or proceedings in which there is no right to a jury trial[.]

data. But the expert may be required to disclose those facts or data on cross-examination.

§ 490.065.2 (emphasis added).

Nothing in this statute requires that jurors must be wholly ignorant of the topic on which the expert would testify or utterly incapable of drawing a proper conclusion from the facts in evidence without it. Instead, the threshold test is merely whether the expert's testimony (which may or may not include opinions) will "help" the jury understand the evidence or decide the contested issues. To be sure, the more a matter is within the common knowledge of the jury (assuming such common knowledge also is correct), the less likely it is that expert testimony about that matter will be helpful to the jury. But this is a continuum. Section 490.065.2 no longer follows the binary analysis of *Lawhorn* and *Taylor* under which expert testimony was admissible only where the jury could not proceed without it. Instead, a qualified expert can offer testimony based on sufficient facts and reliable principles that have been reliably applied whenever such testimony will help the jury understand the evidence and decide the disputed issues.

As discussed below, expert testimony about the reliability of eyewitness identifications meets the requirements of section 490.065.2.[4] *See People v. Lerma*, 47

---

[4] Section 490.065.2 is identical to the Rule 702 of the Federal Rules of Evidence. Where Missouri law adopts language from the Federal Rules of Evidence, federal cases applying those rules are persuasive – though not binding – authority. *State v. Williams*, 548 S.W.3d 275, 285 (Mo. banc 2018). The leading case on Rule 702 is *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), which stressed that Rule 702 is intended to broaden the scope of admissibility expert testimony. Applying *Daubert* and Rule 702, federal courts have approved the use of expert testimony concerning the reliability of expert witnesses. *See, e.g., United States v. Brownlee*, 454 F.3d 131, 144 (3d Cir. 2006) (finding the lower court erred in excluding expert testimony concerning the "confidence-accuracy correlation" with respect to eyewitness identifications); *United States v. Smith*, 156 F.3d 1046, 1053 (10th Cir. 1998) ("[E]xpert

N.E.3d 985, 992-93 (Ill. 2016) (noting the "clear trend" toward the admission of expert testimony "for the purpose of aiding the trier of fact in understanding the characteristics of eyewitness identification"); *Commonwealth v. Walker*, 92 A.3d 766, 782-83 (Pa. 2014) (observing that courts in 44 states, the District of Columbia, and all federal circuit courts that have ruled on the issue, permit expert testimony on eyewitness identifications "for the purpose of aiding the trier of fact in understanding the characteristics of eyewitness identification").

## II.     *Expert testimony about eyewitness identifications is sufficiently reliable*

Because section 490.065.2 was never cited to the circuit court as controlling, the parties did not address its requirements and the circuit court made no specific findings concerning them. On appeal, the state concedes there was no argument below challenging the reliability of the scientific research and conclusions concerning the reliability of eyewitness identifications about which Dr. Lampinen would have testified. Nor could there have been. In the decades since *Lawhorn*, this area has received great attention from the scientific community, and its findings and conclusions are as nearly unanimous as it is possible to be. *See State v. Guilbert*, 49 A.3d 705, 720-21 (Conn. 2012) (collecting studies showing "a near perfect scientific consensus" concerning the

---

testimony on eyewitness identification may properly be admitted under *Daubert* in certain circumstances[.]"); *United States v. Harris*, 995 F.2d 532, 535 (4th Cir. 1993) (finding expert testimony concerning eyewitness identifications admissible under Rule 702 to explain, among other factors, "cross-racial identification, … identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference"). *Cf. State v. Clopten*, 223 P.3d 1103, 1112 (Utah 2009) ("[T]he testimony of a qualified expert regarding factors that have been shown to contribute to inaccurate eyewitness identifications should be admitted whenever it meets the requirements of rule 702 of the Utah Rules of Evidence").

10

potential unreliability of eyewitness identifications and holding that judicial hostility to such evidence in criminal cases is "out of step with the widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror"); *State v. Henderson*, 27 A.3d 872, 916 (N.J. 2011) (explaining scientific research on eyewitness identification has been "tested and retested, subjected to scientific scrutiny through peer-reviewed journals, evaluated through the lens of meta-analyses, and replicated at times in real-world settings" such that it now represents the "gold standard in terms of the applicability of social science research to the law"). Accordingly, the reliability requirements in section 490.065.2(1)(b)-(d) are met.

### III. Expert evidence would have helped this jury understand and evaluate the eyewitness identification in this case

Rather than take on the quixotic task of attempting to undermine the reliability of the wealth of scientific evidence on which Dr. Lampinen's testimony was based, the state argues that jurors are familiar with the factors that can affect the reliability of an eyewitness's identification and, therefore, the jury was not incapable of resolving the issues around Carpenter's guilt or innocence without Dr. Lampinen's testimony. Though such an argument may have been valid under the binary analysis required by *Lawhorn* and *Taylor*, it fails in the more forgiving context of section 490.065.2. Under this statute, the only question is whether his testimony would help the jury understand and evaluate the eyewitness identification evidence in this case and consider the factors set forth in Instruction No. 9. In other words, the question is would the jury be better off with this information than without it. Plainly, the answer is yes. *See Brownlee*, 454 F.3d at 142

11

(explaining "jurors seldom enter a courtroom with the knowledge that eyewitness identifications are unreliable" and, even though "science has firmly established the inherent unreliability of human perception and memory, this reality is outside the jury's common knowledge and often contradicts jurors' commonsense understandings") (citation omitted); *Clopten*, 223 P.3d at 1108 (explaining expert testimony can play an important role in helping a jury understand how various factors affect the reliability of eyewitness identifications because jurors may not understand the "deficiencies in human perception and memory and thus give great weight to eyewitness identifications").

The flaw in the state's argument (and with much of the reasoning in *Lawhorn*) is that it fails to distinguish between credibility and accuracy. One of the jury's principal roles as factfinder is to decide when a witness is seeking to mislead the jury rather than genuinely telling the truth as the witness believes it to be. This is what is meant in most instances when courts say that it is solely within the jury's province to gauge the credibility of the witnesses. For example, expert testimony that a witness with a personal or financial interest in the outcome of a matter may have a motive to mislead the jury is of no help to a jury and should not be admitted.

Accuracy, however, is another matter. *Henderson*, 27 A.3d at 889 ("We presume that jurors are able to detect liars from truth tellers. But as scholars have cautioned, most eyewitnesses think they are telling the truth even when their testimony is inaccurate[.]"). Here, there is no question that Victim was telling the truth as he believed it to be. The question was whether Victim could testify genuinely about something that he was "one hundred percent certain" about … and still be wrong. Jurors tend to give great weight to

12

an eyewitness's confidence in the identification they have made. *See* Gary L. Wells & Amy L. Bradfield, *"Good You've Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience*, 83 J. Applied Psychol. 360, 361 (1998) ("There is good empirical evidence to indicate that the confidence with which eyewitnesses give identification testimony is the most important single quality of testimony in terms of whether participant-jurors will believe that the eyewitness correctly identified the actual perpetrator."). Dr. Lampinen's testimony would have explained the various factors in Instruction No. 9 that can leave an eyewitness genuinely and believably "certain" about an identification and, nevertheless, wrong. *See, e.g.,* Jeffrey S. Neuschatz et al., *A Comprehensive Evaluation of Showups*, 1 Advances in Psychol. & Law 43, 60, 63 (M.K. Miller & B.H. Bornstein eds., 2016) (explaining those who make identification in a "show up" have much greater confidence in their identifications even though the accuracy of those identifications was worse than identifications in a lineup); Laura Smalarz & Gary L. Wells, *Post-Identification Feedback to Eyewitnesses Impairs Evaluators' Abilities to Discriminate Between Accurate and Mistaken Testimony*, 38 Law & Hum. Behav. 194, 200 (2014) ("Mistaken eyewitnesses who had received feedback ultimately delivered testimony that was just as credible as the testimony of accurate eyewitnesses."). Certainly this would have "helped" the jury understand and evaluate Victim's identification in light of Instruction No. 9 and, ultimately, decide the most important fact in issue, i.e., whether Carpenter robbed Victim. Accordingly, the final requirement for admissibility under section 490.065.2(1)(a) is met. *See Clopten*, 223 P.3d at 1113 (expert testimony on factors affecting reliability of eyewitness

13

identifications meets the requirement to "assist the trier of fact"); *Walker*, 92 A.3d at 789 (factors affecting reliability of eyewitness identifications are "beyond [the knowledge] possessed by the average layperson" (alteration in original)).[5]

### IV.   *Expert testimony about the factors that can affect the reliability of eyewitness identifications does not invade the province of the jury*

The state argues that assessing the credibility of witnesses is solely the province of the jury and Dr. Lampinen's testimony was properly excluded because it would have intruded upon that prerogative. This Court disagrees. As explained above, the issue in this case was accuracy, not credibility, and Dr. Lampinen's testimony would have been helpful to the jury in assessing the accuracy of Victim's identification of Carpenter. Dr. Lampinen did not attempt to apply the factors addressed in his testimony to the facts of this case, far less to reach any conclusion or opinion as to the accuracy of the identification. ***This*** is the sole province of the jury, and, in order to do that work, the jury would have been helped by the expert information Dr. Lampinen would have provided. *Clopten*, 223 P.3d at 1114 (expert testimony on the factors affecting reliability of eyewitness identifications "should not be excluded as intruding on the province of the jury"); *Benn v. United States,* 978 A.2d 1257, 1274 (D.C. 2009) (expert testimony about

---

[5]   *See also* Tanja R. Benton et al., *Eyewitness Memory Is Still Not Common Sense: Comparing Jurors, Judges and Law Enforcement to Eyewitness Experts*, 20 Applied Cognitive Psychol. 115, 120 (2006) [hereinafter *Benton Study*] (showing roughly half of prospective jurors were unaware of the suggestive nature and effect of "show up" identifications); *State v. Lawson*, 291 P.3d 673, 705 (Or. 2012) (citing *Benton Study*, 20 Applied Cognitive Psychol. at 120) (explaining fewer than half of jurors correctly understand the relationship between accuracy and confidence and only half understand that confidence can be manipulated); *Henderson*, 27 A.3d at 910 (citing *Benton Study,* 20 Applied Cognitive Psychol. at 120) (explaining fewer than half of jurors understand "the effects of the accuracy-confidence relationship, weapon focus, and cross-race bias").

14

reliability of eyewitness identifications does not usurp function of jury); *Guilbert*, 49 A.3d at 729 (expert testimony about factors affecting reliability of eyewitness identification generally is admissible, but an "expert should not be permitted to give an opinion about the credibility or accuracy of the eyewitness testimony itself; that determination is solely within the province of the jury"); *People v. McDonald,* 690 P.2d 709, 722 (Cal. 1984) (expert testimony about the reliability of eyewitness identifications "does not seek to take over the jury's task of judging credibility … [because] it does not tell the jury that any particular witness is or is not truthful or accurate in his identification"), *overruled on other grounds by People v. Mendoza,* 4 P.3d 265 (Cal. 2000).

## V.     *Availability of cross-examination, closing argument, and MAI-CR 310.02 are not sufficient justifications to exclude otherwise admissible expert evidence*

The state argues that Dr. Lampinen's testimony was properly excluded because Carpenter had sufficient other means to challenge the accuracy of Victim's identification. Again, it relies on *Lawhorn* for this proposition. *See Lawhorn*, 762 S.W.2d at 823 (stating expert testimony on eyewitness identification is "superfluous" because "the weaknesses of identifications can be explored on cross-examination and during counsel's final arguments to the jury"). As discussed below, each of the means available to Carpenter other than expert testimony (i.e., the availability of cross-examination, closing argument, and MAI-CR 310.02) are inadequate. More importantly, however, the entire tenor of this argument (and this Court's analysis in *Lawhorn*) is skewed. It is not for the state to say how (or how much) Carpenter is entitled to defend himself. Subject to the

15

law of evidence, which in this case includes section 490.065.2 and the ordinary confines of legal relevance,[6] Carpenter was entitled to adduce whatever evidence he believed best met the charges against him. As explained above, Dr. Lampinen's testimony was admissible because it would have helped the jury understand that Victim could honestly believe Carpenter robbed him – and testify credibly and with "one hundred percent certainty" to that effect – and still be wrong. Alternatives to admissible evidence do not make such evidence inadmissible.

Even if this were not so, the alternatives relied upon by the state do not justify excluding Dr. Lampinen's otherwise admissible expert testimony. The first alternative cited by the state is that Carpenter's counsel was entitled to (and did) cross-exam the Victim about some (but fewer than all) of the factors that may have made his identification unreliable. In the portion of *Lawhorn* in which this Court held expert evidence about eyewitness identification was "superfluous" because cross-examination was sufficient, *Lawhorn*, 762 S.W.2d at 823, the Court relied upon *State v. Kemp*, 507 A.2d 1387, 1390 (Conn. 1986). After *Lawhorn*, however, the Connecticut Supreme Court overruled *Kemp* and recognized that cross-examination is inadequate to properly assess the reliability of an eyewitness identification. *Guilbert*, 49 A.3d at 725-26. *Guilbert* explains:

---

[6] Legal relevance concerns whether the "probative value of the evidence outweighs unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *State v. Wood*, 580 S.W.3d 566, 575 (Mo. banc 2019) (citation omitted). The state does not contend there was any unfair prejudice in Dr. Lampinen's testimony, let alone that such would have outweighed the probative value of that evidence.

16

> Cross-examination, the most common method, often is not as effective as expert testimony at identifying the weaknesses of eyewitness identification testimony because cross-examination is far better at exposing lies than at countering sincere but mistaken beliefs. An eyewitness who expresses confidence in the accuracy of his or her identification may of course believe sincerely that the identification is accurate. Furthermore, although cross-examination may expose the *existence* of factors that undermine the accuracy of eyewitness identifications, it cannot effectively educate the jury about the *import* of these factors.

*Id*. (footnotes omitted). This Court agrees.

Cross-examination plays a central, critical role in our factfinding process, and it is at its most effective when uncovering bias, inconsistencies and other matters that bear directly on credibility, i.e., on whether the witness is telling the truth as she believes it to be. But it is less effective when exploring accuracy, particularly when the witness is unaware of the factors that may affect such accuracy. *See People v. Boone*, 30 N.Y.3d 521, 531 (2017) (noting that, when an eyewitness is "utterly confident about an identification, expressing the identification or recollection of identification with subjective certainty," she can be "entirely unshakable on cross-examination" even when she is mistaken); *Commonwealth v. Crayton*, 21 N.E.3d 157, 169 (Mass. 2014) ("[W]e have previously recognized how difficult it is for a defense attorney to convince a jury that an eyewitness's confident identification might be attributable to the suggestive influence of the circumstances surrounding the identification."); *Clopten*, 223 P.3d at 1110 ("Because it is unlikely that witnesses will be aware [of the factors affecting the reliability of the identification], they may express far more confidence in the identification than is warranted."). *See also* Jacqueline McMurtrie, *The Role of the Social Sciences in Preventing Wrongful Convictions*, 42 Am. Crim. L. Rev. 1271, 1277 (2005)

("*The Role of Social Sciences*") ("[Cross-examination] is not particularly effective when used against eyewitnesses who believe they are telling the truth.").

The present case illustrates this concern. For example, Victim can admit he was looking at the gun rather than the robber throughout most of the robbery, but he may not understand that this stress and distraction may have impacted the accuracy of his identification. Plainly, he believed it did not. Without expert testimony, therefore, the jury is left only with Victim's possibly incorrect understanding of this – and other – factors. *See Henderson*, 27 A.3d at 910 ("Although many may believe that witnesses to a highly stressful, threatening event will 'never forget a face' because of their intense focus at the time, the research suggests that is not necessarily so."); *Guilbert*, 49 A.3d at 737 (holding the effect of stress on eyewitness identification was outside of "common knowledge" and "would have been helpful to the jury"). Similarly, Victim might know that he and the perpetrators were of different races but likely had no knowledge whether and to what degree this difference in races could affect the reliability of his identification. Finally, cross-examination could never elicit from Victim the inherently suggestive nature of "show up" identifications because he had no knowledge of the relevant science or police procedures. Police may be aware of this science but, in this case, Officer Fisher was asked about it and did not know. Therefore, as to these three factors, among others, cross-examination was of no value to Carpenter and no help to the jury in evaluating the identification evidence in this case.

"[C]ourts around the country have recognized that traditional methods of informing factfinders of the pitfalls of eyewitness identification—cross-examination,

closing argument, and generalized jury instructions—frequently are not adequate to inform factfinders of the factors affecting the reliability of such identifications." *Lawson*, 291 P.3d at 695 (Or. 2012) (collecting cases). *See also Walker*, 92 A.3d at 786 ("[W]e reject reliance upon cross-examination and closing arguments as sufficient to convey to the jury the possible factors impacting eyewitness identification and as justification for an absolute bar of such expert testimony[.]"); *Clopten*, 223 P.3d at 1110 ("[W]e cannot rely on cross-examination as a surefire way to uncover the possibility of mistaken identification."); *State v. Copeland*, 226 S.W.3d 287, 300 (Tenn. 2007) ("[T]he research also indicates that neither cross-examination nor jury instructions on the issue are sufficient to educate the jury on the problems with eyewitness identification[.]").

The state also argues that Carpenter did not need Dr. Lampinen's testimony because the jury was given Instruction No. 9, which lists the same 17 factors affecting the reliability of eyewitness identifications that Dr. Lampinen's testimony would have covered. This instruction states:

> Eyewitness identification must be evaluated with particular care.
>
> In order to determine whether an identification made by a witness is reliable or mistaken, you should consider all of the factors mentioned in Instruction No. 1 concerning your assessment of the credibility of any witness. You should also consider the following factors.
>
> *One*, the witness's eyesight;
>
> *Two*, the lighting conditions at the time the witness viewed the person in question;
>
> *Three*, the visibility at the time the witness viewed the person in question;
>
> *Four*, the distance between the witness and the person in question;
>
> *Five*, the angle from which the witness viewed the person in question;

19

*Six*, the weather conditions at the time the witness viewed the person in question;

*Seven*, whether the witness was familiar with the person identified;

*Eight*, any intoxication, fatigue, illness, injury or other impairment of the witness at the time the witness viewed the person in question;

*Nine*, whether the witness and the person in question are of different races or ethnicities;

*Ten*, whether the witness was affected by any stress or other distraction or event, such as the presence of a weapon, at the time the witness viewed the person in question;

*Eleven*, the length of time the witness had to observe the person in question;

*Twelve*, the passage of time between the witness's exposure to the person in question and the identification of the defendant;

*Thirteen*, the witness's level of certainty of [his] [her] identification, bearing in mind that a person may be certain but mistaken;

*Fourteen*, the method by which the witness identified the defendant, including whether it was

[i. at the scene of the offense;]

[ii. (In a live or photographic lineup.) In determining the reliability of the identification made at the lineup, you may consider such factors as the time elapsed between the witness's opportunity to view the person in question and the lineup, who was in the lineup, the instructions given to the witness during the lineup, and any other circumstances which may affect the reliability of the identification;]

[iii (In a live or photographic show-up.) A "show-up" is a procedure in which law enforcement presents an eyewitness with a single suspect for identification. In determining the reliability of the identification made at the show-up, you may consider such factors as the time elapsed between the witness's opportunity to view the person in question and the show-up, the instructions given to the witness during the show-up, and any other circumstances which may affect the reliability of the identification;]

*Fifteen*, any description provided by the witness after the event and before identifying the defendant;

*Sixteen*, whether the witness's identification of the defendant was consistent or inconsistent with any earlier identification(s) made by the witness; and

*Seventeen*, [other factors.] [any other factor which may bear on the reliability of the witness's identification of the defendant.]

It is not essential the witness be free from doubt as to the correctness of the identification. However the state has the burden of proving the accuracy of the identification of the defendant to you, the jury, beyond a reasonable doubt before you may find [him] [her] guilty.

MAI-CR 3d 310.02 (endnotes omitted).[7]

Like reliance on cross-examination and closing arguments, courts that have considered expert evidence about the reliability of eyewitness identifications have concluded that generalized cautionary instructions like MAI-CR 310.02 do not, by themselves, render such evidence inadmissible. *See Clopten,* 223 P.3d at 1110 (explaining science has shown that cautionary instructions are not effective in helping jurors spot mistaken identifications); *Guilbert*, 49 A.3d at 726 ("[R]esearch has revealed that jury instructions that direct jurors in broad terms to exercise caution in evaluating eyewitness identifications are less effective than expert testimony in apprising the jury of the potential unreliability of eyewitness identification testimony.").[8]   Accordingly,

---

[7]  Among the Notes on Use approved by this Court to accompany MAI-CR 310.02 is Note 1, which states: "Use only those factors that apply to the evidence presented at trial, appropriately renumbering the paragraphs and subparagraphs." Carpenter tendered this instruction with only one change, i.e., he included only the first and third paragraphs under the fourteenth factor. The state had no objection or suggested alteration, and Instruction No. 9 was given as tendered.

[8]  *See also* Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, 2 Fed. Cts. L. Rev. 1, 25 (2007) ("Jury instructions do not explain the complexities about perception and memory in a way a properly qualified person can."); Richard A. Wise et al., *A Tripartite Solution to Eyewitness Error*, 97 J. Crim. L. & Criminology 807, 833 (2007) ("[J]ury instructions lack the flexibility and specificity of expert testimony" and, by themselves, "do not serve as an effective safeguard against mistaken identifications and convictions[.]") (quotation omitted); Peter J. Cohen, *How Shall They Be Known?* Daubert v. Merrell Dow Pharmaceutical *and Eyewitness Identification*, 16 Pace L. Rev. 237, 273 (1996) (explaining detailed jury instructions "list the factors that might contribute to misidentification

MAI-CR 310.02 is not a sufficient basis for excluding otherwise admissible expert testimony on the same subject.

But there is a deeper irony in the state's argument that should be exposed. This Court routinely states, "A jury instruction must be supported by substantial evidence and the reasonable inferences to be drawn therefrom." *State v. Avery*, 275 S.W.3d 231, 233 (Mo. banc 2009). *See also State v. Deck*, 303 S.W.3d 527, 543 (Mo. banc 2010) (counsel "has wide latitude in closing arguments, but closing arguments must not go beyond the evidence presented"). Obviously, MAI-CR 310.02 is a departure from this general rule in that it highlights factors that the overwhelming weight of scientific evidence shows can affect the reliability of an eyewitness identification without discussing that science. It is to be given in cases in which an eyewitness identification is at issue even though no expert has testified regarding that science. This Court hoped, when it approved this instruction, that defendants could obtain the benefit of this science without the delay and expense of having to adduce expert testimony in each case. But to argue, as the state does here, that the availability of this instruction is itself a sufficient ground to exclude otherwise admissible expert testimony stands the ordinary rule that instructions must be based on evidence on its head. The Court could no more accept that argument than it could rule in criminal cases that – so long as a self-defense instruction is given – evidence of self-defense can be excluded or, in civil cases, that evidence of the plaintiff's negligence can be excluded so long as a comparative fault instruction is given.

———————————————————————————

but do not explain the impact these factors can have on memory accuracy … they [also do not] instruct [the jury] on the physiology and psychology of the memory process").

22

Finally, the state's argument that Carpenter did not need Dr. Lampinen's evidence because Carpenter's ability to cross-examine Victim and argue MAI-CR 310.02 in closing arguments to the jury is simply wrong. Nothing in MAI-CR 310.02 tells the jury whether the presence of a particular factor increases or decreases reliability, and nothing in that instruction explains to the jury why these factors have the effect they do or how they can interact. Dr. Lampinen's testimony would have given this context to MAI-CR 310.02. It would have explained *what* effect the listed factors can have on the reliability of an eyewitness identification, *why* those factors can have that effect and, most important, *how* one or more factors can degrade reliability and still leave the eyewitness genuinely believing that he or she is "one hundred percent certain" about that identification. Cross-examination cannot provide this evidence, and nothing in MAI-CR 310.02 allows Carpenter's counsel to explain this science in closing argument unless the jury has heard evidence on that subject. Some of the factors set out in MAI-CR 310.02 may be within the common knowledge of the jury, but this – by itself – does not matter. What matters for purposes of section 490.065.2 is that Dr. Lampinen's testimony, and the scientific context it gives to those factors, would have been helpful to the jury in deciding Carpenter's fate. In particular, it would help the jury understand that these factors can affect the reliability of an eyewitness identification while not affecting the eyewitness's confidence in that identification. The availability of cross-examination and closing argument does not mean that Carpenter had to proceed without this otherwise admissible testimony.

## VI.    The proffer was not improper

The state argues that, even assuming some parts of Dr. Lampinen's proffer were admissible, the circuit court was entitled to reject the entire proffer because other portions of the proffer were not admissible. *See Lott v. Kjar*, 378 S.W.2d 480, 484 (Mo. 1964) ("If several facts are included in the offer, some admissible and others inadmissible, then the whole (if properly objected to) is inadmissible; in other words, it is for the proponent to sever the good and the bad parts.") (citation omitted). Specifically, the state argues there was no evidence that two of the 17 factors Dr. Lampinen testified about (i.e., poor eyesight and various forms of impairment) were present in this case; therefore, his testimony about those factors was inadmissible.

First, it must be noted that – at the time Carpenter made the offer of proof from Dr. Lampinen – there was no evidence of anything. With the state's consent, Carpenter made this offer before the trial began. As a result, it seems incongruous for the state to argue that the proffer extended beyond the facts in evidence. At that point, Carpenter might have had an idea what the state's evidence would show, but no more than that. Second, this offer of proof was made only after the parties had briefed and argued and the Court had sustained the state's motion in limine to exclude ***all*** of Dr. Lampinen's testimony. The state's motion was based on *Lawhorn* and the state's contention that Dr. Lampinen could not testify about the scientific evidence concerning ***any*** of the factors affecting the reliability of eyewitness identifications, not that such testimony must be limited to the factors plainly at issue in the present case. In fact, the state never made this

24

argument, either in the trial court or in the court of appeals, until the case was transferred to this Court.

These procedural issues aside, there is a deeper defect in the state's argument, i.e., it misperceives the nature of Dr. Lampinen's testimony and the grounds on which it should have been admitted. He was not opining that Victim's identification of Carpenter was unreliable and listing the particular factors he believed supported that opinion. Nothing in his proffer suggests he held that opinion and, even if he did, he would never be permitted to testify about it. Nor was Dr. Lampinen testifying generally as to the factors he had selected from the scientific research concerning the reliability of an eyewitness identifications. Instead, Dr. Lampinen was testifying – explicitly – about Instruction No. 9 and what scientific research says about the 17 factors listed there, including the two factors (i.e., eyesight and impairment) that the state now argues were not relevant to this case. As explained above, the whole purpose of this testimony was to give context to Instruction No. 9 and, in particular, help the jury apply the factors listed in that instruction and explain how those factors can decrease reliability without degrading the witness's confidence in the identification.

Carpenter was prepared to – and, ultimately, did – tender MAI-CR 310.02 as Instruction No. 9 without excising any of the 17 factors. At the time Carpenter made the proffer from Dr. Lampinen, therefore, defense counsel had no way of knowing what the evidence would be or what (if any) alterations the state or the court would make to MAI-CR 310.02. As it turns out, the state had no objection and the court read Instruction No. 9 to the jury without change. If reference to the two factors (e.g., eyesight and impairment)

25

in MAI-CR 310.02 that the state now argues were improperly addressed in Dr. Lampinen's proffer was so irrelevant to the case, surely the state would have objected to the proffer on that ground and, at the instruction conference, would have asked the court to remove those two factors from Instruction No. 9 before reading it to the jury as the Notes on Use require. Neither happened, and this Court will not fault Carpenter for tailoring Dr. Lampinen's proffer to Instruction No. 9 as it actually was given rather than to what would have been given had the state made a timely objection to that instruction. Accordingly, based on the circumstances of this case, the Court rejects the state's argument that the circuit court did not err because there were defects in Dr. Lampinen's proffer.

### VII. Carpenter was prejudiced by the exclusion of Dr. Lampinen's testimony

Finally, the state argues that – even if the trial court erred in excluding Dr. Lampinen's testimony, as the Court holds it did – Carpenter's conviction still should be affirmed because this error was not prejudicial. *See* Rule 84.13(b). Because Carpenter was able to cross-examine Victim and use MAI-CR 310.02 to argue to the jury that it should not credit Victim's identification of Carpenter, the state contends he was not prejudiced by the exclusion of Dr. Lampinen's testimony, especially in light of the physical evidence corroborating Victim's identification. The Court rejects this argument.

Evidentiary error alone is not sufficient to vacate a criminal conviction and remand for a new trial. "On direct appeal, this Court reviews the trial court for prejudice, not mere [evidentiary] error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Naylor*, 510 S.W.3d 855, 862 (Mo. banc

26

2017) (quotation omitted). But the exclusion of Dr. Lampinen's testimony deprived Carpenter of his opportunity to present expert evidence about the most important issue the jury had to decide, i.e., whether Victim's identification of Carpenter was mistaken even though Victim genuinely believed he was "one hundred percent certain" he was right. This degree of certainty was the focus of the state's case and was featured on at least five separate occasions in the state's closing arguments. Of course, the jury would not have had to believe Dr. Lampinen or conclude that Victim's identification of Carpenter was mistaken, but it cannot be said Carpenter's trial was fair when he was deprived of the opportunity to put that evidence before the jury and argue its effect.

To be clear, there was evidence corroborating Victim's identification. The police moved extraordinarily quickly in responding to Victim's call and identifying and detaining suspects. From Victim's call to the "show up," no more than five or six minutes elapsed. And there was a trail of discarded property leading directly from the point where Victim saw the young black men disappear into the alley to the point where Sergeant Lenart stopped Carpenter and the other man. But there also was evidence casting doubt on Victim's identification of Carpenter. The robbery was at night. It lasted less than a minute, during most of which Victim said he was staring at the perpetrator's gun. No gun was found despite the apparent recovery of everything else the perpetrators were carrying or wearing. Carpenter and Victim were of different races. The person who threatened Victim was standing, but Carpenter was sitting when Victim identified him. Carpenter was handcuffed and illuminated by a police spotlight. Despite Victim's "one hundred percent" certainty in his identification of Carpenter after this inherently

27

suggestive "show up," he later misidentified the shirt Carpenter had been wearing under his hoodie, said Carpenter had dreadlocks or cornrows when he did not, and thought Carpenter had a goatee when he was clean shaven. In other words, the state's case turned on Victim's identification of Carpenter, and the evidence corroborating this identification was far from overwhelming. Any hope Carpenter had of acquittal turned entirely on whether the jury could be persuaded Victim was wrong even though the jury believed Victim sincerely believed he was "one hundred percent certain." Few cases are balanced on such a precarious edge and, because it was, the likelihood that the Dr. Lampinen's testimony would have altered the outcome is simply too high to affirm this conviction.

## Conclusion

For the reasons set forth above, the judgment of the circuit court is vacated, and the matter is remanded for a new trial.

_____
Paul C. Wilson, Judge

Draper, C.J., Russell, Breckenridge, and Stith, JJ., concur;
Powell, J., dissents in separate opinion filed; Fischer, J., concurs in opinion of Powell, J.

28



# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Respondent,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　　No. SC98088
　　　　　　　　　　　　　　　　　　　)
KANE CARPENTER,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Appellant.　　　　　　　　)

**DISSENTING OPINION**

I respectfully dissent. I agree *State v. Lawhorn*, 762 S.W.2d 820 (Mo. banc 1988), and its progeny have been abrogated by section 490.065.2[1] and should no longer be followed for the well-articulated reasons cited in the principal opinion. However, I do not believe this case allows this Court to appropriately reach this important and significant holding.

While the circuit court should not have excluded Dr. Lampinen's testimony based on the holding in *Lawhorn*, the exclusion was valid for a different reason. As the principal opinion holds, an expert opinion is admissible if the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." § 490.065.2(1)(a). Furthermore,

---

[1] Statutory references are to RSMo Supp. 2018.

a circuit court does not abuse its discretion rejecting an offer of proof if the offer includes both admissible and inadmissible evidence. *State v. Edwards*, 918 S.W.2d 841, 845-46 (Mo. App. 1996). While some of Dr. Lampinen's testimony may have been admissible, portions of his testimony would not have assisted the jury in understanding the evidence at hand. The proffered testimony was, therefore, inadmissible. For example, Dr. Lampinen opined that impaired eyesight and various other impairments affect the reliability of an eyewitness identification. Regardless of the truth and scientific support for this opinion, there was no evidence in the case that the eyewitness had poor eyesight or any other relevant impairment. Without such evidence, this testimony would not help the jury understand the evidence in the case and was logically irrelevant.[2] When a single offer of proof includes multiple expert opinions, each separate opinion must be admissible. Here, Carpenter did not explain the need for expert testimony about multiple discrete topics but instead addressed the need for expert testimony about the subject of eyewitness reliability in general.

Dr. Lampinen's proffered opinion included testimony about the effects of race and human perception on memory, but it also included opinions with no relevance to the case at hand, such as the effect of poor eyesight on eyewitness identifications. The circuit court,

---

[2] Even if there were evidence of poor eyesight or other impairments, the jury does not need expert testimony to understand the effect of this evidence. A juror of ordinary intelligence would understand that poor eyesight may affect the reliability of an eyewitness identification. Recall the scene in *My Cousin Vinny* in which Vinny Gambini famously discredits the eyewitness identification made by a pleasant elderly witness with comically thick glasses: "Maybe you're ready for a thicker set." *My Cousin Vinny* (20th Century Fox 1992).

2

therefore, was entitled to reject the entire proffer because this portion of the testimony was inadmissible. *See Lott v. Kjar*, 378 S.W.2d 480, 484 (Mo. 1964).

To support its holding, the principal opinion correctly observes that the circuit court rejected the proffered testimony prior to the introduction of evidence and without knowing whether eyesight impairment would be a factor in considering the eyewitness identification. In addition, the principal opinion notes the eyewitness identification instruction given to the jury included the eyesight impairment factor. Nonetheless, Dr. Lampinen's opinions regarding eyesight impairment did not "help the trier of fact to understand the evidence or to determine a fact in issue" and, therefore, was inadmissible pursuant to section 490.065.2. Although the circuit court's reliance on *Lawhorn* was misplaced, this Court's primary concern is the correctness of the result; to that end, the circuit court's ruling should be upheld if there is any recognized ground on which the court could have excluded the evidence. *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 766 (Mo. banc 2011). Here, the circuit court had the discretion to exclude Dr. Lampinen's testimony because some of his opinions in his offer of proof were inadmissible beyond the confines of *Lawhorn*. When viewed with the considerable discretion enjoyed by the circuit court for admission and exclusion of evidence, the circuit court's decision here was not "clearly against the logic of the circumstances then before the court," nor did it indicate a lack of deliberate consideration. *Cox v. Kan. City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015). Despite the admissibility of a portion of Dr. Lampinen's testimony,

3

the proffer as a whole was inadmissible, and the circuit court did not abuse its discretion by excluding the testimony.

The principal opinion is an important and highly anticipated change in our law that will improve the fairness of jury trials in this state. The principal opinion's analysis, however, hinges on the procedural posture of the circuit court's ruling. Had the circuit court rejected the proffered testimony after the evidence had been presented and redacted the impaired eyesight factor from the eyewitness identification instruction, this case could have a different outcome under the principal opinion's analysis. Going forward, practitioners should take caution that expert testimony about eyewitness identification must comport with the facts and evidence in the case to be admissible, and practitioners and circuit courts should carefully examine the relevance of the testimony to ensure its admissibility.

For the reasons stated, I would affirm the judgment. While I would relish the opportunity to join the principal opinion in this monumental decision, I must dissent.

_____
W. Brent Powell, Judge

4