People v Clark (2024 NY Slip Op 03586)

People v Clark

2024 NY Slip Op 03586

Decided on July 3, 2024

Appellate Division, Fourth Department

Greenwood, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on July 3, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: LINDLEY, J.P., CURRAN, BANNISTER, GREENWOOD, AND NOWAK, JJ.

160 KA 21-01244

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
CADARRELL D. CLARK, DEFENDANT-APPELLANT.

MARY M. WHITESIDE, NORTH HOLLYWOOD, CALIFORNIA, FOR DEFENDANT-APPELLANT.
SANDRA DOORLEY, DISTRICT ATTORNEY, ROCHESTER (AMY N. WALENDZIAK OF COUNSEL), FOR RESPONDENT.

Greenwood, J.
Appeal from a judgment of the Supreme Court, Monroe County (Sam L. Valleriani, J.), rendered February 2, 2018. The judgment convicted defendant upon a jury verdict of robbery in the first degree (two counts) and robbery in the second degree (two counts). 
It is hereby ORDERED that the judgment so appealed from is affirmed.
Opinion by Greenwood, J.:
On appeal from a judgment convicting him upon a jury verdict of two counts of robbery in the first degree (Penal Law § 160.15 [4]) and two counts of robbery in the second degree (§ 160.10 [1]) arising from a daylight gunpoint robbery initiated by two perpetrators against two victims sitting in a parked vehicle, defendant contends that the verdict is against the weight of the evidence. For the following reasons, we reject defendant's contention as well as the additional contentions he raises on appeal.
I. Facts
On October 17, 2016, between 3:30 and 4:00 p.m., two men approached a vehicle parked behind a laundromat. One man (first perpetrator) approached the driver's side of the vehicle where a man was sitting in the driver's seat (first victim), while a man with a gun (second perpetrator) approached the passenger's side where a woman was sitting in the passenger seat (second victim). The second victim was the key witness at the trial.
The first victim testified that the first and second perpetrators approached them and demanded "everything [they] had." The first victim was unable to recall what the perpetrators were wearing, other than that the second perpetrator was wearing a hoodie. He testified that one of the perpetrators pointed a handgun at them. The first victim handed over a cell phone, jewelry, and keys. He was unable to identify the perpetrators. The second victim, on the other hand, was able to describe and identify the perpetrators. She testified that she was sitting in the front passenger seat of the vehicle when the second perpetrator, who was holding a gun, came around the building and approached her side of the vehicle. He was wearing a black sweater or jacket with the hood up and jeans, and he was pointing a black handgun at her. He repeatedly demanded that she give him "everything," and she gave him her money, a phone, and keys. She testified that the first perpetrator approached the driver's side of the vehicle and that he was wearing a red sweater with what looked like little polka dots. He also repeatedly demanded that the victims empty everything and give it to them, and he urged the man with the gun to "just shoot 'em." The second victim testified that if the second perpetrator did not want what she was offering to him, he told her to put it on the floor; this included her food, napkins, and some papers that were in the vehicle. She explained that she "just wanted to make him happy" and was thus offering him everything she had.
At trial, the second victim was shown a photograph of codefendant and identified him as the first perpetrator, i.e., the man in the red sweater. She was also shown a still photo from video surveillance footage of the front of the laundromat and identified the two men in the photo as the men who robbed them. She testified that she had seen both men prior to the robbery circling the laundromat as she was doing her laundry. Three days after the robbery, the second victim met with an investigator and identified defendant from a six-person photo array as the second perpetrator. The investigator testified that the second victim picked defendant out almost immediately. After the second victim identified defendant, the investigator began writing up the deposition. At that point, the second victim asked to see more photos to "make sure [she] was [a] hundred percent correct" in her identification.
The investigator transported the second victim to the police station, where he assembled additional photo arrays and showed them to her; he also acquiesced to her request to view the first photo array at the same time. The second victim picked out a different photo of defendant, which was actually an older photograph of him. Eight months later, the second victim was asked to view a lineup. She again positively identified defendant and testified that it took her 10 seconds to do so. Finally, the second victim identified defendant at trial. In response to a question from defense counsel on cross-examination, she testified that she "never had doubt" about her identification of defendant.
Three days after the robbery, the police executed a search warrant at codefendant's residence, located about a mile from the scene of the robbery. There, they recovered keys that the first victim identified as his, and they recovered a distinctive red sweater that the second victim identified as the one worn by the first perpetrator during the robbery. The People also presented testimony that defendant and codefendant were brothers and that defendant had been seen at codefendant's residence on occasion.
II. Weight of the Evidence
In determining whether a verdict is against the weight of the evidence, we must first determine whether, "based on all the credible evidence[,] a different finding would not have been unreasonable" (People v Bleakley, 69 NY2d 490, 495 [1987]). If so, "then [we] must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' " (id., quoting People ex rel. MacCracken v Miller, 291 NY 55, 62 [1943]). Weight of the evidence review is not an "open invitation" for an appellate court to substitute its judgment for that of the jury (People v Cahill, 2 NY3d 14, 58 [2003] [internal quotation marks omitted]). Rather, in reviewing the evidence, we "must give '[g]reat deference' to the jury's verdict . . . precisely because '[t]he memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by those who see and hear than by those who simply read the printed narrative' " (People v Romero, 7 NY3d 633, 645 [2006]). Stated another way, it is the "fact-finder[ ]" that has the "opportunity to view the witnesses, hear the testimony and observe demeanor" (Bleakley, 69 NY2d at 495), and "those who see and hear the witnesses can assess their credibility and reliability in a manner that is far superior to that of reviewing judges who must rely on the printed record" (People v Lane, 7 NY3d 888, 890 [2006]).
Contrary to the conclusion of the dissent, the facts of this case do not warrant the substitution of our credibility determinations for those made by the jury (see generally People v Delamota, 18 NY3d 107, 116-117 [2011]). We conclude that the second victim's identification of defendant was not "incredible and unbelievable, that is, impossible of belief because it [was] manifestly untrue, physically impossible, contrary to experience, or self-contradictory" (People v Wallace, 306 AD2d 802, 802-803 [4th Dept 2003] [internal quotation marks omitted]). The issues of her identification of defendant and her credibility "were properly considered by the jury and there is no basis for disturbing its determinations" (People v Gonzalez, 208 AD3d 981, 982 [4th Dept 2022], lv denied 39 NY3d 940 [2022] [internal quotation marks omitted]; see People v Brown, 204 AD3d 1390, 1393 [4th Dept 2022], lv denied 39 NY3d 985 [2022]; see generally Bleakley, 69 NY2d at 495). We note that the second victim "never wavered in her testimony regarding the events or her identification of defendant" (People v Freeman, 206 AD3d 1694, 1696 [4th Dept 2022] [internal quotation marks omitted]).
The dissent concludes that the verdict is against the weight of the evidence because this was a cross-racial identification by the second victim, her memory was flawed and tainted by police suggestivity, and her identification was the only evidence against defendant.
Initially, contrary to the repeated statements of the dissent, the second victim's identification of defendant was not the only evidence implicating him. As noted earlier, defendant was the brother of codefendant, who was conclusively linked to the robbery. The second victim identified both defendant and codefendant as the perpetrators, so this is not a situation in which a victim mistakenly identifies a relative of the actual perpetrator. While the dissent gives no weight to the fact that codefendant and defendant were brothers, the jury could certainly infer that the second victim's identification of defendant as the second perpetrator was not merely an unfortunate coincidence for defendant.
Regarding the second victim's identification of defendant, all of the reasons raised by the dissent as to why it believes her identification was unreliable were addressed forcefully by defense counsel during cross-examination of the witnesses, including extensive questioning of the second victim regarding her ability to observe the second perpetrator while under the stress of the event and extensive questioning of the investigator regarding police procedures and policies for conducting photo arrays. Defense counsel repeated those points in summation, including the point that the jury should take into account that this was a cross-racial identification. The jury thus had before it all the arguments as to why the second victim's identification of defendant might be incorrect, yet it still found her identification of him credible, for good reason. She identified defendant on four separate occasions.
We disagree with the dissent's characterization of the second victim's identifications of defendant from the two photo arrays as wavering and uncertain. She quickly identified defendant in the first photo array and simply wanted to see additional arrays to be certain of her identification. Although she identified a different photograph of defendant in the second photo array procedure, she was still identifying defendant as the second perpetrator. We note that the two photographs of defendant have obvious similarities, but there are differences too, including an age difference and the fact that defendant has slightly longer hair and is squinting a bit in one of the photographs.
We further disagree with the dissent that police suggestivity tainted the second victim's identification of defendant. We note that the dissent's reliance on amendments to CPL 60.25 is misplaced. CPL 60.25 allows the admission of a pretrial identification made by a witness as evidence in chief only where the witness at trial has a lack of present recollection of the defendant as the perpetrator (see People v Patterson, 93 NY2d 80, 82 [1999]; People v Bryant, 211 AD3d 848, 849-850 [2d Dept 2022], lv denied 39 NY3d 1077 [2023]; People v Ott, 200 AD3d 1642, 1645 [4th Dept 2021], lv denied 38 NY3d 953 [2022], cert denied — US &mdash, 143 S Ct 403 [2022]). That statute does not apply here inasmuch as the second victim was able to positively identify defendant at trial as the second perpetrator. Instead, the testimony regarding the two photo array identification procedures was introduced after defense counsel opened the door to that testimony by asking the second victim whether she told the investigator that she was second-guessing her identification of defendant as the second perpetrator (see People v Jones, 147 AD3d 1551, 1552 [4th Dept 2017], lv denied 29 NY3d 999 [2017], reconsideration denied 29 NY3d 1082 [2017]; People v Williams, 142 AD3d 1360, 1361 [4th Dept 2016], lv denied 28 NY3d 1128 [2016]). In any event, as the dissent recognizes, at the time the photo arrays were conducted, they were not required to be made pursuant to a " 'blind or blinded procedure' " (CPL 60.25 [1] [c]; see People v Shabazz, 211 AD3d 1093, 1099 n 1 [3d Dept 2022], lv denied 39 NY3d 1113 [2023]).
Regarding the second photo array procedure, "[i]t is well settled that '[m]ultiple pretrial identification procedures are not inherently suggestive' " (People v Morgan, 96 AD3d 1418, 1419 [4th Dept 2012], lv denied 20 NY3d 987 [2012]; see People v Wilson, 120 AD3d 1531, 1532 [4th Dept 2014], affd 28 NY3d 67 [2016], rearg denied 28 NY3d 1158 [2017]). Here, as noted, a different photograph of defendant was used in the second photo array (see People v Dickerson, 66 AD3d 1371, 1372 [4th Dept 2009], lv denied 13 NY3d 859 [2009]). Further, we disagree with the dissent that any possible taint from the photo arrays also tainted the lineup identification conducted months later (see Morgan, 96 AD3d at 1419-1420). Indeed, "the potential for irreparable misidentification is not manifest when the eyewitness views an array [*2]containing a photograph of the defendant and subsequently views the defendant in person during a lineup" (id. [internal quotation marks omitted]), particularly here, where the lineup was not conducted until eight months later.
With respect to the second victim's memory of the incident, any discrepancies in her description of the perpetrators' clothing was minor and could be attributed to the stress of the event, but that does not lead us to conclude that the verdict is against the weight of the evidence (see generally Romero, 7 NY3d at 645-646). Although video surveillance footage showed the second perpetrator wearing a ball cap, he could have removed that prior to the robbery or pulled his hoodie over it. The second victim also testified that it looked like the second perpetrator had a shaved head under his hoodie, whereas an officer testified at trial that he saw defendant five days after the robbery and he looked like he did at the trial, i.e., without a shaved head. Nevertheless, we note that the photographs of defendant in the first photo array and from the lineup show that he had closely-cropped hair and a high forehead, and when wearing a hoodie, the front part of his head could appear bald or shaven.
We disagree with the dissent that this case is similar to People v Miller (191 AD3d 111, 115 [4th Dept 2020]), in which this Court reversed a conviction on the weight of the evidence where the only evidence linking the defendant to the crime was the eyewitness identification of him by the victim. We found several factors that called into question the reliability of the identification (see id. at 116) but, importantly, we also found "considerable objective evidence supporting defendant's innocence" (id.). That is simply not the case here. The video evidence showing codefendant wearing a red hoodie and dark pants, rather than the red hoodie and red pants described by the second victim, and showing the second perpetrator wearing a ball cap when the second victim never testified that the second perpetrator was wearing a cap, is not nearly of the same magnitude as the objective evidence supporting the defendant's innocence in Miller.
"Sitting as the thirteenth juror . . . [and] weigh[ing] the evidence in light of the elements of the crime[s] as charged to the other jurors" (People v Danielson, 9 NY3d 342, 349 [2007]), we conclude that, although a different verdict would not have been unreasonable, it cannot be said that the jury failed to give the evidence the weight it should be accorded (see generally Bleakley, 69 NY2d at 495; People v Davis, 115 AD3d 1167, 1168-1169 [4th Dept 2014], lv denied 23 NY3d 1019 [2014]).
III. Jury Charge
Defendant failed to preserve for our review his contention that County Court's charge to the jury regarding cross-racial identifications was inadequate (see Gonzalez, 208 AD3d at 982; People v Wisniewski, 191 AD3d 1435, 1437 [4th Dept 2021], lv denied 36 NY3d 1125 [2021]). In any event, we conclude that defendant's contention is without merit and note that the court instructed the jury using the model instruction on one-witness identifications and cross-racial identifications (see generally People v J.L., 36 NY3d 112, 122-123 [2020]; People v Heiserman, 127 AD3d 1422, 1424-1425 [3d Dept 2015]).
Contrary to defendant's further contention, the court did not abuse its discretion in denying defendant's request for a jury instruction on the photo array procedures used by an investigator (see generally People v Inniss, 83 NY2d 653, 659 [1994]; People v Carmona, 168 AD3d 499, 500 [1st Dept 2019], lv denied 33 NY3d 1029 [2019]). The charge as given conveyed the relevant legal principles regarding witness identifications, and through defense counsel's extensive cross-examination of the investigator on the issue and his summation to the jury, the jury was aware of the need to carefully scrutinize the second victim's identification of defendant (see generally Inniss, 83 NY2d at 659; People v Linares, 167 AD3d 1067, 1070-1071 [3d Dept 2018], lv denied 33 NY3d 950 [2019]).
IV. Sentence
We reject defendant's contention that, in sentencing him, the court improperly penalized him for exercising his right to a jury trial. " 'The imposition of a more severe sentence after trial than that offered to defendant pursuant to a plea offer that [defendant] rejected, without more, does not support the contention of defendant that he was penalized for exercising his right to go [*3]to trial' " (People v Brown, 67 AD3d 1427, 1427 [4th Dept 2009], lv denied 14 NY3d 839 [2010]; see People v Konovalchuk, 148 AD3d 1514, 1515 [4th Dept 2017], lv denied 29 NY3d 1082 [2017]). We conclude that the record contains no evidence that the sentence was the product of retaliation or vindictiveness against defendant (see People v Gorton, 195 AD3d 1428, 1430 [4th Dept 2021], lv denied 37 NY3d 1027 [2021]; Konovalchuk, 148 AD3d at 1515). The sentence is not unduly harsh or severe.
V. Conclusion
Accordingly, we affirm the judgment.
All concur except Nowak, J., who dissents and votes to reverse in accordance with the following memorandum: "I don't know if I got the right guy." Seated in a police cruiser at 9:40 p.m. on an October night three days after the robbery, the only witness to identify defendant began to question whether "she picked out the correct person" and second guess whether defendant was involved in the robbery. She thus requested to see additional arrays for three individuals—half of the men—shown in the initial array.
The investigator conducting the photo arrays drove the witness (referred to by the majority as the "second victim") to the police station and prepared three additional photo arrays by placing each potential suspect in a separate array. The investigator then permitted the witness to flip the three new arrays, along with the initial array on which she had circled defendant's photograph, and view the four arrays together, in express violation of Rochester Police Department rules. During that second viewing of photo arrays, the witness purported to "change her mind," disavow her initial identification, and identify someone who she believed to be a different person entirely. However, the investigator corrected her, saying, "that just happens to be the same person you picked out in the first array."
Approximately eight months after the robbery, the witness viewed a police lineup and identified defendant in mere "seconds." At trial, the witness was shown a still photo taken from surveillance video at the laundromat and identified defendant during her live testimony. Neither the still photo nor the surveillance video from the laundromat were entered in evidence, and they are not part of the record on appeal.
Despite her repeated uncertainty during the first and second photo arrays, the witness told the jury that she "never had doubt" whether defendant was the perpetrator who brandished the gun.
Defendant was convicted of two counts of robbery in the first degree (Penal Law § 160.15 [4]) and two counts of robbery in the second degree (§ 160.10 [1]). Because the lone evidence of defendant's guilt was the witness' cross-racial identification, the product of her flawed memory tainted by police suggestivity, I respectfully dissent.
Where, as here, a defendant contends that the verdict is against the weight of the evidence, this Court is obligated to review the factual findings of the jury (see People v Danielson, 9 NY3d 342, 348 [2007]; see generally CPL 470.15 [5]) and, if an acquittal would not have been unreasonable, we "must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks omitted]; see People v Miller, 191 AD3d 111, 115 [4th Dept 2020]). The "Court of Appeals has stressed the importance of the role of the Appellate Division in serving, 'in effect, as a second jury,' to 'affirmatively review the record; independently assess all of the proof; substitute its own credibility determinations for those made by the jury in an appropriate case; determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt' " (People v Carter, 158 AD3d 1105, 1112 [4th Dept 2018], quoting People v Delamota, 18 NY3d 107, 116-117 [2011]; see People v Oberlander, 94 AD3d 1459, 1459 [4th Dept 2012]).
Inasmuch as "the only evidence linking defendant to the crime was the eyewitness identification by the [witness]," I agree with the majority that an acquittal would not have been unreasonable (Miller, 191 AD3d at 115). Upon my review of the weight of the evidence, I note [*4]several factors that call into question the reliability of the witness' identification of defendant as one of the robbers. First, the stress of a robbery and the presence of a gun increase the likelihood of misidentification (see id. at 116). Here, the witness—who admitted that her attention was on the gun and that her life "flashe[d] before [her] eyes"—was so nervous during the robbery that she attempted to assuage the robbers by giving them the food she was eating and the napkins in her lap.
It is perhaps unsurprising, then, that the witness was not able to accurately perceive and recall the events of the robbery just after it occurred. Indeed, in the statement she gave mere minutes after the robbery, she asserted that one man wore a black sweatshirt with the hood up and no hat and that the other man wore red sweat pants. Those details, however, were contradicted by surveillance video from a nearby CVS store that showed the perpetrators as they left the scene. Moreover, she described the man in black as having a shaved head, but when police encountered defendant some five days after the robbery, he was not bald and his head was not shaven.
The inconsistencies between the witness' contemporaneous account and the objective evidence only highlight the impermissibly suggestive police procedures in this case. The codefendant, who was defendant's brother, was identified by three separate individuals at the laundromat hours after the robbery. Thus, three days later, police effected a search at the one-bedroom apartment where defendant's mother and brother both resided. Later that night, one of the investigators who participated in the search prepared the initial photo array containing defendant's photograph and presented it to the witness in his police cruiser. The investigator administering the array knew that defendant was a suspect and was aware of defendant's location in the array at the time he presented it to the witness and, thus, this was not a blind array as contemplated by CPL 60.25 (1) (c).
CPL 60.25 was amended effective July 1, 2017, to require "preclusion of testimony regarding the identification procedure as evidence in chief" where the identification was the result of a non-blind procedure (CPL 60.25 [1] [c]), a tacit, if not express, recognition by the legislature that non-blinded arrays are so suggestive as to require preclusion as evidence in chief as a matter of course. The amendment was effective at the time of trial (and at the time of the Wade hearing), but not when the photo array was conducted.
Upon viewing the inherently suggestive initial array, the witness identified defendant, but shortly thereafter began to question if "she picked out the correct person" saying, "I don't remember—I don't know if I got the right guy." The witness thus requested additional arrays for three of the six individuals, and the same investigator compiled additional non-blind arrays by placing each individual in a separate array with five other people.
The second identification procedure compounded the suggestive nature of the initial array in three crucial ways. First, the arrays were inherently suggestive, inasmuch as the investigator who prepared them knew the location and identity of the suspect at the time he presented the arrays to the witness (see CPL 60.25 [1] [c]). Second, by allowing the witness to have the photo of defendant—which she previously circled—in front of her while viewing the subsequent arrays, the investigator essentially turned the procedure into a subconscious matching game in express violation of Rochester Police Department rules and regulations; regulations presumably promulgated to prevent misidentification. Most critically, however, the investigator gave the witness false sense of security in her identification by confirming that she had identified the same person twice, despite the fact that she purported to disavow her initial identification, "change her mind," and identify a different suspect. When the witness expressed uncertainty as to her identification, the investigator's improper conduct removed all doubt.
The fact that the witness later identified defendant in "[l]ess than 30 seconds" during a subsequent lineup does little to cure the improperly suggestive police conduct in this case; rather, it shows the extent to which the improperly suggestive police conduct tainted the witness' subsequent identifications. Contrary to the majority's suggestion, defendant does not argue, and I do not conclude, that multiple pretrial identification procedures are, in and of themselves, inherently suggestive (see People v Morgan, 96 AD3d 1418, 1419 [4th Dept 2012], lv denied 20 NY3d 987 [2012]). Rather, the specific facts and circumstances of the identifications here were unduly suggestive (see generally People v Marshall, 26 NY3d 495, 504 [2015]). Here, the [*5]witness was repeatedly uncertain about her identification—so much so that she could rule out only 50% of the men shown in the initial array—and became convinced of her identification only after viewing two suggestive photo arrays punctuated by the administering investigator's commentary, where he all but patted her on the back and told her she got the right man.
The relative ease with which the witness identified defendant in "seconds" during the subsequent lineup, and at trial where she testified that she "never had doubt" as to defendant's identity, stands in stark contrast to her earlier wavering and uncertain identifications which took place just three days after the robbery but lasted several hours. "It is inescapable that '[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification' " (Marshall, 26 NY3d at 503, citing United States v Wade, 388 US 218, 228 [1967]). In fact, "[r]egardless of how the initial misidentification comes about, the witness thereafter is apt to retain in . . . memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification" (Simmons v United States, 390 US 377, 383-384 [1968]).
To that end, studies have shown that even in the absence of suggestive police procedures, witnesses tend to grow more confident over time; however, confidence does not make an identification more accurate (see People v Perdue, 41 NY3d 245, 258 [2023, Rivera, J., dissenting]). Indeed, one study found that, "out of 190 DNA exonerations involving a misidentification, 40% involved a witness who did not initially identify the innocent suspect but by the time of trial were completely certain of their identification" (id. at 259 [Rivera, J., dissenting]).
The peril of relying on the witness' identification here is underscored by the fact that police did not recover any stolen items in a manner that directly implicated defendant (see People v Coffie, 192 AD3d 1641, 1642 [4th Dept 2021], lv denied 37 NY3d 963 [2021]; Miller, 191 AD3d at 116). The search of the one-bedroom apartment where defendant's mother and codefendant brother resided did not produce the weapon or any other physical evidence tying defendant—as opposed to his brother—to the crime. The majority reasons that codefendant's possession of stolen property implicated defendant merely because the two men were related and defendant visited his mother and codefendant at their apartment. Taken to its logical conclusion, any person related to a criminal defendant is also implicated in that defendant's criminal activity merely by visiting with them.
It is of no small moment that the witness was white and thus the identification was cross-racial, compounding its unreliability (see generally People v Boone, 30 NY3d 521, 534-536 [2017]), particularly in light of the inaccuracy of the witness' memory when compared to the surveillance video, the impermissibly suggestive identification procedures, and the absence of any tangible link between the stolen property and defendant. Indeed, "[m]istaken eyewitness identifications are 'the single greatest cause of wrongful convictions in this country' " (id. at 527), and the "likelihood of misidentification is higher when an identification is cross-racial" inasmuch as "people have significantly greater difficulty accurately identifying members of other races than members of their own race" (id. at 528). As set forth above, during the initial photo array, the witness requested to see additional photographs of three of the six individuals—all black men who look nothing alike—because she was uncertain as to her identification. During a subsequent photo array, the witness circled a different photograph of defendant. As the majority notes, "the two photographs of defendant [from the initial and second array] have obvious similarities;" nonetheless, the witness believed that she was identifying a different person entirely.
Unlike the majority, I find no solace in the jury's credibility determination, given the "risk that a jury may credit a tainted identification" (Perdue, 41 NY3d at 250). Indeed, " 'there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says "That's the one!" ' " (Watkins v Sowders, 449 US 341, 352 [1981, Brennan, J., dissenting]).
Defendant does not argue on appeal that Supreme Court erred in refusing to suppress the witness' pretrial identifications. Nor does he argue that the suggestive nature of the photo arrays tainted the subsequent identification procedures so as to require preclusion of the witness' in-[*6]court identification (see Marshall, 26 NY3d at 504). Had defendant challenged the court's Wade ruling on appeal, we could have evaluated those contentions (see id.; see generally Perdue, 41 NY3d at 252-253). Nonetheless, viewing the evidence in light of the elements of the crime as charged to the jury (see Danielson, 9 NY3d at 349), I conclude that the jury "failed to give the evidence the weight it should be accorded" (Bleakley, 69 NY2d at 495). I would therefore reverse the judgment and dismiss the indictment (see CPL 470.20 [5]; People v Marchant, 152 AD3d 1243, 1244 [4th Dept 2017]).
"We can and must do better to protect the integrity of the criminal legal system and to protect defendants by avoiding the risk of convictions of the innocent based on misidentifications" (Perdue, 41 NY3d at 254 [Rivera, J., dissenting]).
Entered: July 3, 2024
Ann Dillon Flynn
Clerk of the Court